UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:03-cr-00033-JAW-01 |
| | ) | |
| WILLIAM LELAND | ) | |

**ORDER DENYING MOTION FOR RECONSIDERATION OF ORDER ON
PETITION FOR WRIT OF AUDITA QUERELA PURSUANT TO THE ALL
WRITS ACT, 28 U.S.C. § 1651, DENYING MOTION TO EXPUNGE
CONVICTION, AND GRANTING PRO SE MOTION TO REDUCE
SENTENCE**

On August 20, 2014, William Leland moved for reconsideration of his pro se motion for writ of audita querela, which asked the Court to recalculate his sentencing guideline range to eliminate a two-level enhancement for obstruction of justice, to grant a three-level reduction for acceptance of responsibility, and to allow a further two-level reduction pursuant to Amendment 782 of the United States Sentencing Guidelines.  Mr. Leland separately asks the Court to expunge his conviction for possession of a firearm by a felon.  Finally, he later filed a separate pro se motion to reduce sentence.  The Court denies the motion for reconsideration of its order denying the motion for writ of audita querela, denies the motion to expunge his firearms conviction, denies the motion based on ineffective counsel, but grants the motion for reduction of sentence under Guidelines Amendment 782 and reduces his sentence from 252 months to 201 months.

**I.    BACKGROUND OF MOTION FOR WRIT OF AUDITA QUERELA
PURSUANT TO ALL WRITS ACT, 28 U.S.C. § 1651**

## A.     Motion and Order

Sentenced on October 28, 2005 to 252 months of incarceration for seven federal felonies, representing his leadership role in a major drug trafficking conspiracy involving cocaine, methamphetamine, oxycodone, marijuana, and MDMA (Ecstasy) and possession of a firearm by a felon, William Leland has waged a determined and relentless campaign to obtain a court order reducing his sentence.   The primary source of Mr. Leland's discontent is that the sentence was more severe than the one he thought he was going to receive under the terms of the plea agreement with the Government.

### 1.     The Plea Agreement

The plea agreement provided in part:

3.  Pursuant to Fed. R. Crim. P. 11(c)(1)(B) the parties agree to take the following positions at sentencing:

A.  The parties agree to recommend that the Court find that the Base Offense Level pursuant to U.S.S.G. § 2D1.1 is 32 and that the amount of the narcotics and other illegal substances involved in all reasonably foreseeable acts or omissions of the defendant and other co-conspirators totals between 1,500 and 3,000 kilograms of marijuana on the drug equivalency table.

B.  The parties agree to recommend that the evidence does not support a finding that any dangerous weapon (including a firearm) was possessed in relation to any of the drug offenses.

C.  The parties agree to recommend that the Court find that the offense level should be increased by four (4) points under U.S.S.G. § 3B1.1(a) because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

D.  The Government agrees to recommend  that the Court find that the Defendant has accepted responsibility for the offenses of

conviction in the above-captioned Indictment, and that the Court should reduce by 3 levels Defendant's Adjusted Offense Level under U.S.S.G. § 3E1.1.

The Government reserves the right not to recommend a reduction under U.S.S.G. § 3E1.1 if, at any time between his/her execution of this Agreement and sentencing Defendant (a) fails to admit a complete factual basis for the plea; (b) fails to truthfully admit his/her conduct in the offenses of conviction; and (c) falsely denies or frivolously contests relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3.  Defendant understands that he/she may not withdraw his/her guilty plea if, for any of the reasons listed above, the Government does not recommend that he/she receive a reduction in Offense Level for acceptance of responsibility.

4.  The Government and the Defendant agree to recommend that the Court impose a period of imprisonment within the applicable guideline range, in addition to restitution and supervised release to be determined by the Court at the time of sentencing.  The parties agree not to seek any further additions or reductions to the guidelines, other than those set forth in section Three.  The parties agree not to seek nor recommend any upward or downward departures.  The parties expressly agree and understand that these recommendations will not be binding on the Court and should the Court reject the recommendations of the parties, Defendant will not thereby be permitted to withdraw his/her guilty plea.  The parties agree and understand that the Court has the discretion to impose any lawful sentence.

*Agreement to Plead Guilty* at 4-5 (ECF No. 207) (*Plea Agreement*).  Finally, in

paragraph 6, Mr. Leland agreed not to "appeal or collaterally attack any matter

pertaining to this prosecution and sentence as long as the sentence of imprisonment

is less than 210 months." *Id.* at 5.

## 2.   The Rule 11 Hearing

On January 27, 2004, the Court engaged Mr. Leland in an extensive Rule 11

colloquy.  *Tr. of Proceedings* at 1-29 (ECF No. 306).  The Court specifically advised

Mr. Leland that the statutory maximum for two of the counts was life imprisonment.

*Id.* at 7:15-23. The Court warned Mr. Leland that depending on the drug quantity, there were statutory minimum sentences of either ten or five years. *Id.* at 8:21-9:8. The Court reviewed detailed contents of the plea agreement with Mr. Leland. First, the Court established that Mr. Leland was pleading guilty to the charged crimes because he was actually guilty and that he was truthfully admitting to the facts underlying the offenses:

> THE COURT: Now, Mr. Leland, have you pled guilty to Counts 1, 2, 3, 6, 8, 10, and 14 of the second superseding indictment of this case because you are actually guilty?
>
> THE DEFENDANT: Yes.

*Tr. of Proceedings* at 5:16-19 (ECF No. 306) (*Rule 11 Hr'g*).

……………

> THE COURT: Now, as a part of your pleading guilty, I must find there's a factual basis for your guilty plea, and to assure myself there is such a factual basis, I will be asking you questions about the conduct that gave rise to these charges, and you must answer my questions truthfully. Do you understand?
>
> THE DEFENDANT: Yes, sir.

*Id.* at 16:8-14. Later, the Court returned to the prosecution version of the offenses and asked Mr. Leland direct questions about the underlying facts:

> THE COURT: Now, Mr. Leland, have you had an opportunity to review [the] government's version of the offense dated January 27, 2004?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: I'm going to ask a very important question, Mr. Leland, and I want your honest answer. Is there any respect with which you disagree with what is set forth in government's version of the offense dated January 27, 2004?

> THE DEFENDANT:  No, sir.
>
> THE COURT:  Is the information contained in the government's version of the offense dated January 27, 2004, true to your own personal knowledge?
>
> THE DEFENDANT:  Yes, it is.

*Id.* 18:5-18.  Before turning to the Plea Agreement, the Court directly asked Mr. Leland whether anyone had threatened him or attempted to force him in any way to plead guilty:

> THE COURT:  Now, the next part of this process, Mr. Leland, is for me to assure myself that you're pleading guilty today voluntarily, of your own free will.  So I am going to ask you a number of questions directed to that issue.  Has anyone threatened you or has anyone attempted to force you to get you in any way to plead guilty?
>
> THE DEFENDANT:  No.

*Id.* 18:24-19:5.

The Court also questioned Mr. Leland closely about his understanding of the Plea Agreement's sentencing provisions:

> THE COURT:  This contains a number of references to recommendations that the parties agree to make to the court concerning base offense levels and whether the evidence supports a finding of a dangerous weapon possessed in relation to the drug offense, increases in points, acceptance of responsibility, and other matters.  Did you review that paragraph before coming into court today?
>
> THE DEFENDANT:  Yes, I did.
>
> THE COURT:  What I want you to understand, Mr. Leland, is this.  That as far as sentencing is concerned, this plea agreement permits you and your lawyer, Mr. Largay, and the prosecutor to make recommendations to the court regarding sentencing, but the authority to determine the appropriate sentence in this case rests with me as the judge in this court. Do you understand that, sir?

THE DEFENDANT:  Yes, sir.

THE COURT:  If I do not accept the recommendations, even those recommendations that are set forth in paragraph 3, you will have no right to withdraw your guilty plea.  Do you understand?

THE DEFENDANT:  Yes, I do.

*Id.* at 22:24-23:19.

The Court addressed with Mr. Leland the potential impact of the Sentencing

Guidelines:

THE COURT:  I can't determine the guideline sentence until I've read a presentence report the probation office will prepare and until I've given your lawyer and the prosecutor an opportunity to challenge the facts in the probation office report.  After I determine what guideline does apply to the case, I still have the authority in some circumstances to impose a sentence that is more severe or it could be less severe than the sentence called for by the applicable guideline.  Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  What I want you to understand, Mr. Leland, [is] that even if I impose a sentence that is more severe than the one called for by the applicable guideline, you will still not be permitted to withdraw your guilty plea.  Do you understand?

THE DEFENDANT:  Yes, I do.

*Id.* 23:25-24:15.

Finally, the Court directly asked Mr. Leland whether there were any side deals

not set forth in the Plea Agreement:

THE COURT:  Now, aside from this written plea agreement, has anyone made any promises to you in an effort to get you to plead guilty?

THE DEFENDANT:  No, sir.

THE COURT:  Has anyone made any promises to you as to what kind of sentence I will ultimately impose?

6

THE DEFENDANT:  No, sir.

THE COURT:  Has anyone made any promises to you, other than what is contained in paragraph 3 of the agreement to plead guilty?  Has anyone made any promises to you, other than what is set forth there - -

THE DEFENDANT:  No.

THE COURT:  - - as to what the prosecutor's recommendation will be?

THE DEFENDANT:  No.

*Id.* 25:3-17.

### 3.    The Presentence Report

On May 4, 2004, the Probation Office (PO) issued its first version of the Presentence Report (PSR) in this case and it revised the PSR on May 26, 2004 and October 19, 2005.  PSR at 2.  The PSR contained some disturbing news.  Regarding the PO's comments on obstruction of justice, paragraph 60 of the PSR read:

> In March 2004, following his guilty plea, defendant Leland wrote a letter to members of the Hell's Angels noting his desire to cause bodily injury to codefendant Robert Stewart, as Stewart provided incriminating information to authorities regarding Leland.  Therefore, the defendant, directly or indirectly, attempted to threaten, intimidate or otherwise unlawfully influence a codefendant or witness.  Further, in March 2004, defendant Leland disseminated discovery material to others, including prison inmates, known felons in the community and other Hell's Angels.

*Id*. at 17.  The PO recommended that the Court impose a two-level enhancement for obstruction of justice and deny the three-level reduction for acceptance of responsibility.  *Id*. at 18.  The PO calculated Mr. Leland's offense level as follows:  (1) it began with a base offense level of 32 based on drug quantity, (2) it applied a two-level dangerous weapons enhancement, (3) it applied a four-level organizer or leader

enhancement (4) it recommended a two-level enhancement for obstruction of justice, and (5) it denied acceptance of responsibility. The result was a total offense level of 40. *Id.* at 17-18. The PO calculated Mr. Leland's criminal history category at Category II. *Id.* at 20. It arrived at a Guideline sentence range of imprisonment of between 324 and 405 months. *Id.* at 23.

### 4.    The Motion to Withdraw the Guilty Plea

On January 19, 2005, Mr. Leland moved to withdraw his guilty plea. *Mot. to Withdraw Guilty Plea* (ECF No. 279). In his motion, he argued that (1) he had discovered that his wife was involved in an affair with one of the Government's confidential informants and that together they had plotted to put him in prison, (2) his wife had the opportunity and apparent desire to place methamphetamine in the vehicle in which he was traveling, (3) that there were repeated weight changes, color changes, and packing differences in the alleged methamphetamine found in the spare tire of the vehicle in which the Defendant was traveling, (4) that the Government improperly seized the Defendant's camera and film, (5) that the then-recent issuance of the *United States v. Booker*, 543 U.S. 220 (2005) required that the Defendant be allowed to withdraw his guilty plea, (6) that the Government failed to provide the Defendant with all pertinent discovery, and (7) that Pamela Paradis, a co-conspirator, admitted she perjured herself when she testified at Mr. Leland's detention hearing. *Id.* at 1-2. In the motion, Mr. Leland's counsel wrote that "there are many issues with the discovery that the Defendant believes support his claim of innocence." *Id.* at 3.

### 5.    The Hearing on the Motion to Withdraw Guilty Plea

8

On March 10, 2005, the Court held an oral argument on the motion to withdraw the guilty plea at which Mr. Leland was present. *Tr. of Proceedings* (ECF No. 290). During that hearing, his counsel confirmed that Mr. Leland was "without knowledge that the methamphetamine was in the tire in the trunk of his car." *Id.* Attach. 1 at 32:25-33:3. He also asserted that he was in fact innocent of any of the crimes to which he pleaded guilty, including the firearm possession charge. *Id.* at 30:24-31:1 ("I conferred with him a moment ago, Your Honor. He maintains innocence with respect to more than just that one crime"); 33:25-34:2 (THE COURT: "So he didn't possess the firearm? MR. LARGAY: That's what he maintains").

### 6. The Order on the Motion to Withdraw Guilty Pleas

On April 7, 2005, the Court denied Mr. Leland's motion to withdraw his guilty pleas. *Order on Def.'s Mot. to Withdraw Guilty Plea* (ECF No. 291).

### 7. The Presentence Conference

At the final Presentence Conference on October 24, 2005, the Court raised the question of the Probation Officer's recommendation to impose an obstruction of justice enhancement. *Tr. of Proceedings* at 5:25-8 (ECF No. 341) (*Presentence Conf. Tr.*). The Court confirmed that Mr. Leland objected to the obstruction of justice enhancement on two grounds: "First, that the letter about Mr. Stewart is not as some would interpret it to be; and, secondly, that he didn't disseminate discovery, rather, the discovery was stolen from his cell." *Id.* at 6:11-14. The Government took the position that under the terms of the plea agreement, it could not argue for an

obstruction enhancement. *Id.* at 6:15-20. The Court also discussed acceptance of responsibility. *Id.* at 9:4-20.

### 8.    The Sentencing Hearing

The Court sentenced Mr. Leland on October 27, 2005. *Tr. of Sentencing Hr'g* (ECF No. 339) (*Sentencing Hr'g*). During the sentencing hearing, the Court adopted much of what the parties had agreed to in the Plea Agreement in calculating the Guideline sentence range. The Court began with the base offense level of 32, *Plea Agreement* ¶ 3(A); it added a four-level enhancement for leadership role, *id.* ¶ 3(C); and, although the issue was a close one, the Court accepted the parties' argument that the firearms enhancement would not apply. *Id.* ¶ 3(B).

### a.    The Obstruction Enhancement

This left two issues: whether Mr. Leland had attempted to obstruct justice and whether he should be accorded acceptance of responsibility. The obstruction of justice issue first related to a letter in Mr. Leland's distinctive handwriting to a man named "David" discussing Robert Stewart, a codefendant and witness against Mr. Leland. *Sentencing Hr'g* at 62-63. Referring to Mr. Stewart, Mr. Leland's letter stated in part:

> Sending some paperwork that you and others in your area will be interested in . . . That bastard has been a rat since 2000. He told a lot of lies about me.

*Id.* at 62. Mr. Leland's letter then referred to a man named Alan McDougal and said:

> Both of them have been rats for a long time . . . The club didn't support me through this because of them, and now the club knows the difference. I hope they come around. Well, David, I always like you a lot and wanted you to know what he was. I pray I meet him in here someday. He thinks he's tough. I'll show the asshole what tough is. You take care of yourself.

10

*Id.* Mr. Leland signed the letter "Your real friend, Bill Leland, Hells Angels." *Id.* at 62-63. Mr. Leland attached seven pages of investigative reports that detailed Mr. Stewart's involvement in the greater conspiracy. *Id.* at 63. At the end of the investigative report, Mr. Leland wrote:

Look at that. The asshole gave up his in-laws. What a nice guy.

*Id.*

A second matter was a letter dated April 26, 2004 that Mr. Leland wrote his son, Derek Leland, thanking him for "photocopying all that stuff on Omar and Donny Grace." *Id.* Mr. Leland says that the information "is going to help me a lot." *Id.* He asked his son to mark the information "Legal correspondence" in the lower right-hand corner and mail it to Walter Cobb at the same address as his, namely the Maine State Prison. *Id.* The Government produced evidence that Mr. Leland's request to his son violated the prison's mail policy. *Id.* Omar and Don Grace were both prosecuted, convicted and sentenced as members of Mr. Leland's drug trafficking conspiracy. *See United States v. Don Grace*, Docket No. 1:07-cr-00007-JAW, Docket No. 1:02-cr-00017-JAW; *United States v. Omar Grace*, Docket No. 1:02-cr-00017-JAW.

A third matter was the fact that when law enforcement executed a search warrant at the Old County Road, Hampden, Maine residence of a man named Thomas Dunroe, a known and convicted drug dealer, they came upon an extensive Drug Enforcement Agency (DEA) investigative report, detailing the status of a number of DEA investigations in the Bangor, Maine area. *Sentencing Hr'g* at 63-64. A cover letter in the report was from Assistant United States Attorney (AUSA) Daniel Perry

11

to Attorney Christopher Largay, who was Mr. Leland's defense counsel, and the cover letter referenced the criminal docket number of this case. *Id.* at 64.

Regarding Mr. Leland's letter about Robert Stewart, the Court found that "it constitutes a threat against Mr. Stewart" and observed that "I can't understand any other purpose in the letter other than to alert other individuals who may know Mr. Stewart that he was acting as a witness against Mr. Leland and to have them take the kinds of action that Mr. Leland promises to take." *Id.* at 64-65. The Court noted that the threat against Mr. Stewart was serious enough in itself, but that Mr. Leland later filed a motion to withdraw his guilty plea and if that motion had been successful, Mr. Stewart "would have been front and center during the course of that trial." *Id.* at 65. The Court found the information that Mr. Leland had received from his son and had urged his son to send to Walter Cobb to involve Omar and Don Grace, "both of whom are mentioned as being connected with Mr. Leland in the drug distribution crime to which he has pleaded guilty." *Id.* at 65. Finally, the Court said that "whoever sent [the DEA] information to Mr. Dunroe had the intent to obstruct or interfere with an ongoing governmental investigation." *Id.* It offered two possibilities: Mr. Leland or Attorney Largay. *Id.* at 65. Although Mr. Napolitano offered a third possibility, namely another inmate, the Court noted that there was "no evidence other than what I have before me" and the "only inference I can draw is that it was sent to Mr. Leland and then found its way one way or the other from Mr. Leland's cell to the Old County Road." *Id.* at 66-67.

Based on all of this information, the Court applied the two-level obstruction of justice enhancement under USSG § 3C1.1. *Id.* at 67-68. The Court concluded that Mr. Leland's letter to "David" was a threat against a material witness, that his letter to Derek Leland was a violation of prison regulations and involved co-conspirators, and that Mr. Leland was involved in the dissemination of information he had received from his attorney that obstructed or attempted to obstruct an ongoing federal investigation of Bangor area drug dealing. *Id.* at 67-68.

### b.     Acceptance of Responsibility

Unlike the obstruction of justice enhancement, where the Government did not seek the enhancement pursuant to the terms of its Plea Agreement, the Government actively argued that Mr. Leland should not receive the three-level reduction for acceptance of responsibility under USSG § 3C1.1. *Id.* at 69. The Government contended that Mr. Leland had breached the Plea Agreement by frivolously filing his motion to withdraw his guilty plea and falsely contending that he was actually innocent of the charged crimes. *Id.* The Government also noted that as the Court had imposed the obstruction of justice enhancement, the Guidelines provide that acceptance of responsibility should ordinarily not be given. *Id.*

The Court denied the acceptance of responsibility reduction because following the guilty plea, Mr. Leland had repeatedly falsely claimed his innocence in letters to the Court and by filing his motion to withdraw his guilty plea. *Id.* at 73-78.

### c.     Criminal History

13

At the sentencing hearing, counsel agreed that Mr. Leland was a criminal history category I, not II as was set forth in the PSR. *Id.* at 78.

### d. Guideline Calculations

The Court found the base offense level to be 32. *Id.* at 81-82. The Court applied the following enhancements: (1) a four-level organizer or leader enhancement under USSG § 3B1.1(a), and (2) a two-level obstruction of justice enhancement under USSG § 3C1.1. *Id.* at 82. The Court declined to apply the two-level dangerous weapons enhancement, and declined to allow a reduction for acceptance of responsibility. *Id.* The total offense level was 38 and the criminal history category was I, resulting in a Guideline sentence of 235 to 293 months. *Id.* The Court imposed a 252-month sentence in the lower end of the applicable Guideline sentence range. *Id.* at 102.

### B. Fourteen Post-Trial Motions

Mr. Leland has never accepted the 252-month sentence and has kept the courts and Government busy responding to his numerous legal challenges to the sentence; in particular, he rankles at the Court's obstruction of justice and acceptance of responsibility conclusions and has waged an unremitting and determined effort to force the Court to alter its judgment and impose a more lenient sentence.

First, on October 31, 2005, he appealed to the First Circuit Court of Appeals the Court's denial of his motion to withdraw the guilty pleas and he complained about the asserted ineffectiveness of his prior counsel. On September 22, 2006, the First Circuit rejected Mr. Leland's complaint about the motion to withdraw his guilty pleas and concluded that his arguments about ineffective counsel were premature; it

14

affirmed the judgment of conviction and sentence. *United States v. Leland*, 196 Fed.

App'x 9 (1st Cir. 2006).

Second, on January 29, 2007, acting on the First Circuit's suggestion, Mr.

Leland moved to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. §

2255. *Leland v. United States*, Docket No. 07-10-JAW, *Mot. Under 28 U.S.C. § 2255

to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody* (ECF No. 1).

In that filing, Mr. Leland objected to the fact that he was not allowed to withdraw his

guilty pleas and he says that he tried to appeal that decision but his lawyer failed to

prosecute it after filing the notice of appeal. *Id.* at 5. He also complained that his

attorney had convinced him to plead guilty and that he did not understand that in

entering into the plea agreement, he was waiving his rights. *Id.* at 6. Mr. Leland

finally contended that his lawyer delayed the filing of the motion to withdraw the

guilty pleas and that the courts had held that delay against him in denying his

motion. *Id.* at 8.

The Court referred this motion to the Magistrate Judge for a recommended

decision and on June 13, 2007, the Magistrate Judge issued an eleven-page decision,

recommending that the § 2255 motion be denied. *Recommended Decision on 28

U.S.C. § 2255 Mot.* (ECF No. 8). On June 20, 2007, Mr. Leland moved for this Judge

to recuse himself from ruling on the § 2255 motion and objected to the Recommended

Decision. *Mot. for Recusal* (ECF No. 9); *Def.'s Objections to Recommended Decision

28 U.S.C. § 636(b)(1)(B)* (ECF No. 10). On July 5, 2007, the Court issued a six-page

ruling, affirming the Recommended Decision and denying the motion to recuse.

*Order on Pl.'s Mot. for Recusal and on Magistrate Judge's Recommended Decision* (ECF No. 13). Mr. Leland appealed that Order to the First Circuit Court of Appeals, *Notice of Appeal* (ECF No. 16), and on December 17, 2007, the First Circuit Court of Appeals denied his appeal in a brief opinion. *J.* (ECF No. 23).

Third, on September 24, 2008, Mr. Leland moved for a sentence reduction. *Def. William Leland's Pro Se Mot. for Sentence Reduction* (ECF No. 350). The basis of his motion was that the Court erred when it imposed the two-level obstruction of justice enhancement and denied the three-level reduction for acceptance of responsibility and Mr. Leland urged the Court to impose the ten-year mandatory minimum term of incarceration. *Id.* at 1-7. In his motion, Mr. Leland repeatedly mentioned that AUSA Perry had told the Court that the Government was not seeking the enhancement. *Id.* at 1-2. He also claimed that he had no idea how the DEA information had ended up in Thomas Dunroe's Hampden home and speculated that a man named Lance Palmer, apparently a friend of Mr. Dunroe's, who was an inmate at the Maine State Prison while Mr. Leland was there, may have taken the discovery. *Id.* at 2-3. Mr. Leland also claimed that he should have been accorded acceptance of responsibility. *Id.* at 4-6.

On October 28, 2008, the Court denied Mr. Leland's motion for sentence reduction. *Order Denying Def.'s William Leland's Pro Se Mot. for Sentence Reduction* (ECF No. 354). Stating for the first time what was to become a recurring theme, the Court explained to Mr. Leland that "the law severely constrains the ability of the sentencing court to reduce a sentence and the grounds upon which it may do so." *Id.*

16

at 3.  The Court quoted 18 U.S.C. § 3582(c) as stating the general rule that a "court may not modify a term of imprisonment once it has been imposed."  *Id.*  The Court then reviewed the narrow circumstances that the law allows a sentencing judge to revisit a sentence and determined that none of those circumstances was present in Mr. Leland's case.  *Id.*  Finally, the Court observed that Mr. Leland had the right to challenge his sentence under 28 U.S.C. § 2255, but that he had already unsuccessfully done so, and the law requires him to obtain the approval of the appellate court before filing a second or successive § 2255 petition.  *Id.* at 3-4.

Fourth, on November 5, 2009, Mr. Leland filed an application for leave to file a second or successive motion to vacate his sentence under 28 U.S.C. § 2255.  *Appl. for Leave to File a Second or Successive Mot. to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 by a Prisoner in Federal Custody* (ECF No. 356).  But Mr. Leland apparently quickly thought the better of it and withdrew the petition.  *Withdrawal of Appl. for Leave to File a Second or Successive Mot. to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255* (ECF No. 357).

Fifth, perhaps taking a cue from the Court's October 28, 2008 opinion, Mr. Leland attempted to obtain the First Circuit Court of Appeals' approval to file a second or successive petition under § 2255 based on newly discovered evidence and on December 10, 2009, the First Circuit denied his application, explaining that because the new evidence relates to sentencing issues and has no bearing on his conviction, it "does not meet the stringent gatekeeping requirements applicable to successive § 2255 petitions."  *J.* at 1 (ECF No. 359).

Sixth, having failed to obtain the approval of the First Circuit Court of Appeals, on January 6, 2010, Mr. Leland returned to this Court in an attempt to obtain approval for a second or successive motion to vacate, set aside or correct the sentence. *Appl. for Leave to File a Second or Successive Mot. to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 by a Prisoner in Federal Custody* (ECF No. 360). On February 9, 2010, the Court denied Mr. Leland's application for a second or successive motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. *Order on Appl. for Leave to File a Second or Successive Mot. to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 by a Prisoner in Fed. Custody* (ECF No. 363). Again, on February 9, 2010, in a six-page decision, the Court explained to Mr. Leland that it was "without authority to act on his petition." *Id.* at 4-5. This was because Mr. Leland's direct appeal had been denied and his first § 2255 petition had been denied as well. *Id.* The Court quoted the authorizing statute:

> Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

*Id.* at 5 (quoting 28 U.S.C. § 2244(b)(3)(A)). In other words, the Court explained to Mr. Leland, "[b]efore this Court may act on his petition, the Court of Appeals must first act favorably; here, the Court of Appeals has acted but unfavorably." *Id.*

Seventh, on March 29, 2010, Mr. Leland filed another motion for resentencing. *Mot. for Resentencing* (ECF No. 364). In this motion, he reiterated his position that he knew nothing about Thomas Dunroe, that he merited a ten-year mandatory minimum sentence, that he had made progress in jail and had learned his lesson, and

18

that the Court should "find it in your heart" to consider resentencing him. *Id.* at 1-4.

He attached an affidavit from Thomas Dunroe, who swore that he does not know Mr.

Leland, never met him, and never received anything in the mail from him. *Id.* Attach.

1, *Aff. of Thomas Dunroe* at 1 (*First Dunroe Aff.*).   On March 30, 2010, the Court

denied Mr. Leland's motion. *Order Denying Pro Se Mot. to Reduce Sentence* (ECF No.

365).   In an eight-page opinion, the Court noted that it had already issued two orders

in which it had explained to him that it did not have the authority to reduce his

sentence, but it again reviewed the narrow circumstances where the law grants a

sentencing judge such authority and found that none of those circumstances applied.

*Id.* at 1-8.   The Court ended by stating:

> The Court takes Mr. Leland at his word and congratulates him for his
> post-incarceration efforts at rehabilitation, but those efforts will have to
> be their own reward.

*Id.* at 7-8.

Eighth, on June 23, 2010, Mr. Leland filed a motion to reduce sentence under

Rule 60. *Mot. for Relief from a Final J. Under Rule 60(b)/(d)* (ECF No. 366).   He

again attached an affidavit from Thomas Dunroe that contained essentially the same

information as the affidavit attached to the March 29, 2010 motion.[1]  *Id.* Attach. 1,

---

[1]      On close examination, the first and second affidavits appear to be signed by different people
despite the fact that both were supposedly signed on February 12, 2009 by Thomas Dunroe.
         In the first affidavit, Mr. Dunroe misspells his own last name.   He adds an "s" to Dunroe,
making his last name "Dunroes."   In the second affidavit, he correctly spells his last name—without
the "s".   Furthermore, even though the signatures may be the handwriting of the same person, there
are subtle odd differences between the Dunroe signatures on both affidavits.   *See First Dunroe Aff.* at
2; *Second Dunroe Aff.* at 2.
         Equally odd, the signatures of "Rose Marie Brooks", the notary public before whom both
affidavits were signed, are entirely different and do not appear to be those of the same person.   *See
First Dunroe Aff.* at 2; *Second Dunroe Aff.* at 2.

*Aff. of Thomas Dunroe* at 1 (*Second Dunroe Aff.*).  Also, Mr. Leland denied that his letter to "David" about Robert Stewart was threatening.  *Id.* at 2.  On September 7, 2010, the Court denied this motion.  *Order Denying Mot. for Relief from Final J. Under Rule 60(b)/(d)* (ECF No. 371).  The Court explained again in detail that it did not have the authority to reduce his sentence, but it also addressed his assertion that the letter to Mr. Stewart was not threatening.  *Id.* at 1-6.  The Court pointed out that in the letter, Mr. Leland had called Mr. Steward a "bastard" and a "rat", that he said Mr. Stewart had "told a lot of lies about me", that Mr. McDougal and Mr. Stewart had been "rats for a long time".  *Id.* at 3.  Mr. Leland also told "David" that the "club" did not support him because of "them", presumably Mr. Stewart and Mr. McDougal, and now the club "knows the difference."  *Id.*  Mr. Leland prayed that he would encounter Mr. Stewart in prison so that he could "show the asshole what tough is."  *Id.*

In the opinion, the Court noted that other courts had imposed an obstruction of justice enhancement in similar situations and that this Court had done so in another case as well.  *Id.* (citing *United States v. Belskis*, 477 F. Supp. 2d 237, 244-47 (D. Me. 2007) (applying the obstruction of justice enhancement when the defendant called a confidential informant, accused her of being a DEA agent, and told her she was "going to fucking get it").  But more to the point, the Court noted that Mr. Leland "keeps filing the same motion, earnestly repeating his contention about the Dunroe papers." *Id.* at 5.  The Court commented that it "remained convinced that Mr. Leland knows full well that he was very angry with Mr. Stewart and that he threatened to harm him." *Id.*  The Court concluded, "[i]n short, for the last time, the Court cannot

grant Mr. Leland's repeated motions because it does not have the authority to change his sentence and because if it could, it would not." *Id.* at 6.

Ninth, undeterred, on September 24, 2010, Mr. Leland moved this Court to reconsider its order denying his motion for Rule 60 relief. *Pro Se Appl. to Recons. Pet'r's Rule 60(b) (d) Mot.* (ECF No. 374).  On October 29, 2010, the Court denied the motion. *Order Denying Mot. for Recons.* (ECF No. 376).

Tenth, on November 15, 2010. Mr. Leland filed the same motion for reconsideration with the Court of Appeals for the First Circuit. *Pro Se Mot. for Relief Under 60(b) (d)* (ECF No. 377).  Once the Court determined that Mr. Leland had filed the motion as a duplicate in this Court, the Court struck the motion on December 22, 2010. *Order to Strike Mot. to Reduce Sentence* (ECF No. 381).

Eleventh, on November 23, 2011, Mr. Leland filed a motion to amend the PSR on the ground that his sentence violated the terms of the Plea Agreement and that the PSR attributed "ghost drugs", namely drugs supplied by someone else and distributed by other members of his conspiracy. *Pet. to Amend the Presentence Investigation Report* at 2-5 (ECF No. 382).  Mr. Leland also asserted that Deputy Chief Julie Morse of the District of Maine PO informed him that this Court "has the jurisdiction to amend the P.S.I." and that she further agreed that his objections were "not resolved prior to sentencing." *Id.* at 4-5 (emphasis in original).  On January 4, 2012, the Court denied Mr. Leland's motion to amend the PSR. *Order on Mot. to Amend Presentence Report* (ECF No. 384).  The Court noted that Mr. Leland had raised the Plea Agreement issue numerous times before, that it had been consistently

21

rejected, and that the drug quantity calculation was consistent with the precise terms of the Plea Agreement. *Id.* at 2-3. The Court also noted that it was too late for Mr. Leland to raise questions about drug quantity and that he should have done so when he appealed his sentence to the Court of Appeals. *Id.* at 3. Finally, the Court rejected Mr. Leland's characterization of Deputy Chief Morse's September 19, 2011 letter and the Court reiterated that it does not have the authority to rewrite a PSR over six years after a sentencing. *Id.* at 4.

Twelfth, on January 19, 2012, Mr. Leland filed a motion for downward departure. *Mot. for Downward Departure Based on Extra Ordinary Confinement of Fed. Inmate in a Non-Federal Pre-Trial Institution* (ECF No. 385). Citing *United States v. Brinton*, 139 F.3d 718 (9th Cir. 1998), Mr. Leland suggested that because he was held in state prison during pretrial and presentencing phases, he should have received a downward departure. *Id.* at 1-7. On March 5, 2012, the Court denied his motion. *Order on Mot. for Downward Departure* (ECF No. 388). The Court reminded Mr. Leland that it does not have the authority to reduce his sentence. *Id.* at 2. It noted that in any event, the *Brinton* case would not have provided him any relief because the Ninth Circuit Court of Appeals expressed skepticism about a district judge's decision to downward depart to account for time the defendant had spent in state prison and the Ninth Circuit instructed the sentencing judge to reconsider the ruling. *Id.* at 2-3.

Thirteenth, on February 23, 2012, Mr. Leland filed a motion for order of transfer. *Mot. for Order of Transfer* (ECF No. 387). In that motion, Mr. Leland asked

22

the Court to order the Bureau of Prisons to transfer him either to state prison in Maine or to federal prison in Berlin, New Hampshire. *Id.* at 1-5. On April 11, 2012, the Court denied Mr. Leland's motion, explaining that the Bureau of Prisons, not the sentencing judge, has the authority to place an inmate. *Id.* at 1-3.

Fourteenth, on February 3, 2014, the First Circuit Court of Appeals denied Mr. Leland's motion to correct sentence, noting that the motion was "in substance an application for leave to file a second or successive application under 28 U.S.C. § 2255." *J.* at 1 (ECF No. 391).

## C.    The Fifteenth Motion: Petition for Writ of Audita Querela

Mr. Leland's fifteenth motion before either this Court or the Court of Appeals is his motion for writ of audita querela. *Pet. for Writ of Audita Querela Pursuant to the All Writs Act, 28 U.S.C. § 1651* (ECF No. 392) (*Def.'s Pet.*). In his petition, Mr. Leland says that "two (2) men were in prison and unavailable at the time of sentencing that have since been freed and have signed sworn affidavits to prove Petitioner did not commit Obstruction of Justice." *Id.* at 2. He maintains that "the Sixth Amendment requires juries, not judges, find facts relevant to sentencing." *Id.* Mr. Leland again denies knowing Thomas Dunroe or sending discovery to him and he again insists that his letter to Robert Stewart was not threatening. *Id.* at 6-7. Mr. Leland says that he entered into an oral plea agreement and that oral and written plea agreements are different. *Id.* at 6, 8. Mr. Leland then argues that Attorney Largay, his initial counsel, and Attorney Napolitano, his second lawyer, were ineffective. *Id.* at 10-11. He asked the Court to reduce his sentence to "time served"

23

or 159 months. *Id.* at 12. Mr. Leland asserts that the Court erred in relying on statements in the PSR that he contested, that the Court's enhancement findings were insufficient, and that his sentence is too disparate from the sentences of other members of the conspiracy. *Id.* at 13-17. Finally, Mr. Leland recalculates his sentence omitting the two-level obstruction of justice enhancement, granting the three-level acceptance of responsibility reduction, and reducing his sentence in accordance with Amendment 782, resulting in a new Guideline range of 108 to 135 months. *Id.* at 18. He requests "immediate release." *Id.*

### D.    The Court's Order on the Petition for Writ of Audita Querela

On January 14, 2015, citing eleven of its prior orders, the Court denied Mr. Leland's petition for writ of audita querela, *Order on Pet. for Writ of Audita Querela Pursuant to the All Writs Act, 28 U.S.C. § 1651* (ECF No. 407).

### E.    Motion for Reconsideration

On February 6, 2015, Mr. Leland filed a motion for reconsideration. *Mot. to Recons. Pet'r's Writ of Audita Querela Pursuant to the All Writs Act, 28 U.S.C. § 1651* (ECF No. 408) (*Def.'s Mot.*). Mr. Leland complains bitterly that the "merits of this motion have <u>never</u> been ruled on." *Id.* at 1 (emphasis in original). He argues:

1) He has "repeatedly submitted '4' four sworn affidavits proving he did not commit what the court said he did, which was obstruction of justice;" *id.*;

2) The "prosecutor told the court multiple times that the government did not seek the enhancement;" *id.*;

24

3) Mr. Leland "has submitted Supreme Court caselaw that states that a judge is an impartial arbiter and should only rule on the charges brought on by the government;" *id.* at 1-2;

4) Mr. Leland "has submitted caselaw that states that informing someone that they are under investigation <u>is not</u> Obstruction of Justice," that he "didn't do that as the court accused him, but even if he did, it is not Obstruction of Justice," *id.* at 2;

5) Mr. Leland is "claiming Robert Napolitano was ineffective in these motions, yet the government is misleading this court by telling you that you've ruled on this allegation already.  When in fact, this court has ruled on the case petitioner filed against Chris Largay, petitioner's first counsel," *id.*;

6) Mr. Leland says he was "deprived of this right to <u>Due Process</u> when the court surprised him and the prosecutor when he was charged with the crime of Obstruction of Justice at his sentencing.  Petitioner was not allowed to defend himself against these charges.  The prosecutor objected, but the court wouldn't listen." *Id.* (emphasis in original);

7) Mr. Leland says he is a pro se litigant and therefore, if he mislabeled his motion, the Court has the obligation to "re-label it and either rule on the merits of his motion or send it to the proper court so that they can rule on the merits of his motion.  That has <u>never</u> happen[ed]!

25

That is why this petitioner has filed motion after motion." *Id.* at 3 (emphasis in original);

8) Mr. Leland says that he is "<u>Not Guilty</u> of Obstruction of Justice and should not be doing <u>21</u> years in prison when he was promised by the United States Government that he would receive the minimum mandatory <u>10</u> year sentence. *Id.* (emphasis in original);

9) Mr. Leland asserts that "[i]f the court would only rule on the merits and look at the proof that petitioner keeps submitting to this court, petitioner would never file another motion." *Id.*

### F.    A Letter Writing Campaign

With Mr. Leland's motion for reconsideration, the Court received numerous letters from his family and friends, asking the Court to impose a time served sentence:

1) Letter dated February 15, 2015 from "Goodin" signed by "a concerned community member, friend, a mother, a family member";

2) Letter dated February 24, 2015 from Matt Leland, Mr. Leland's youngest brother;

3) Letter dated February 23, 2015 from Linda M. Smithson;

4) Letter undated from Thomas B. Leland, Mr. Leland's brother;

5) Letter dated February 23, 2015 from Stacey Leland, Mr. Leland's sister in law;

6) Letter dated February 23, 2015 from Brenda O'Brien, Mr. Leland's cousin;

7) Letter dated February 24, 2015 from Molly Dunbar;

8) Letter undated from Virginia King, mother in law to Mr. Leland's brother; and

9) Letter undated from Allie Wilcox, Sr.

## II.   DISCUSSION

The Court disagrees with Mr. Leland's remonstration that it has never explained why it cannot change his sentence. This Court and the Court of Appeals have issued ruling after ruling, explaining that once a defendant exhausts a direct appeal and once a defendant has filed an unsuccessful habeas corpus petition under § 2255, the sentencing judge has virtually no authority to alter an imposed sentence. Nevertheless, the Court will again set forth why it cannot legally change Mr. Leland's sentence for the reasons he has cited and why those reasons are in any event insufficient.

### A.   The Writ of Audita Querela

"The writ of audita querela, introduced during the reign of Edward III, is sometimes available to reopen a judgment when an important matter concerning a defendant's case has arisen since the entry of judgment." *Trenkler v. United States*, 536 F.3d 85, 90 n.2 (1st Cir. 2008). The First Circuit described a writ of audita querela, part of the All Writs Act, 28 U.S.C. § 1651, as "'a common law writ constituting the initial process in an action brought by a judgment defendant to obtain relief against the consequences of the judgment on account of some matter of defense or discharge arising since its rendition and which could not be taken

advantage of otherwise.'"[2]   *United States v. Holder*, 936 F.2d 1, 2 (1st Cir. 1991) (quoting BLACK'S LAW DICTIONARY 120 (5th ed. 1979)).  In *Holder*, the First Circuit explained:

> [I]f available at all [in criminal proceedings], the writ of audita querela can only be available where there is a *legal* objection to a conviction, which has arisen subsequent to that conviction, and which is not redressable pursuant to another post-conviction remedy.

*Id.* at 5 (emphasis in original).[3]  Put differently, to obtain relief under audita querela, a defendant must point to something "occurring since his conviction that would render his conviction illegal."  *Id.*  To assume that the writ could be available in some cases, however, does not mean that it is available in Mr. Leland's case.[4]

In any case, it is not.  Although the First Circuit has stated that the writ of audita querela may be available to "reopen a judgment when an important matter concerning a defendant's case has arisen since entry of the judgment", *Trenkler*, 536

---

[2]    The *Holder* Court noted that the writ of audita querela has been abolished under the civil rules.  *Holder*, 936 F.2d at 2 (citing FED. R. CIV. P. 60(b) (now (e)).  However, the First Circuit observed that in 1954, the United States Supreme Court held that the writ of coram nobis was still available in criminal proceedings and the First Circuit concluded that the writ of audita querela may still be available in criminal proceedings.  *Id.*

[3]    The First Circuit did not rule that the writ of audita querela is viable.  The First Circuit "emphasize[d] that nothing herein is meant to suggest our affirmative resolution of the difficult question of the survival and availability of this ancient and some might think outmoded writ."  *Holder*, 936 F.2d at 2.  Following the First Circuit's lead, the Court assumes without deciding that a writ of audita querela is potentially available to Mr. Leland.

A cousin of the writ of audita querela is the writ of coram nobis.  The difference between the writ of coram nobis and the writ of audita querela is considered to be one of timing.  The writ of coram nobis may be used by a rendering court to "correct its own judgment on the basis of some patent error affecting the validity or regularity of that judgment."  *Trenkler*, 536 F.3d at 90 n.2.  As noted, the writ of audita querela, in contrast, may be available to "reopen a judgment when an important matter concerning a defendant's case has arisen since entry of the judgment."  *Id.*

[4]    Mr. Leland cites *Kessack v. United States*, No. CO5-1828Z, 2008 U.S. Dist. LEXIS 7739 (W.D. Wash. Jan. 18, 2008) as support for his petition.  *Def.'s Pet.* at 1.  However, as the district court in Rhode Island observed, *Kessack*'s "holding that the unavailability of § 2255 relief justifies proceeding under the All Writs Act, 28 U.S.C. § 1651, is contrary to the law of this circuit."  *Manjarres v. United States*, CR No. 00-049-ML, 2010 U.S. Dist. LEXIS 36214, at *15 (D.R.I. Apr. 13, 2010).

F.3d at 90 n.2, the Court has noted that the writ of audita querela "does not and cannot, under any stretch of imagination, provide a purely equitable basis for relief independent of any legal defect in the underlying judgment", *Holder*, 936 F.3d at *3.

The First Circuit further explained that a writ of audita querela is not available to a petitioner when other remedies, such as a § 2255 petition, exist. *See Trenkler*, 536 F.3d at 97 ("[W]hen a statute—like section 2255—specifically addresses a particular class of claims or issues, it is that statute, not the All Writs Act, that takes precedence. The armamentarium of common-law writs . . . is thus available only to fill whatever interstices exist in the post-conviction remedial scheme made available to federal prisoners by way of section 2255." (internal citation omitted)). The First Circuit directed, "[w]here a prisoner has filed a motion for relief under one of the common law writs, the court must examine the substance of the motion to determine whether the claim is one that would be cognizable under section 2255." *United States v. Rivera-Lebron*, 410 Fed. Appx. 352, 353 (1st Cir. 2011).[5]

The first problem is that to the extent Mr. Leland has raised or could have raised these issues, he cannot raise them again through a writ of audita querela and to the extent he has not raised them previously, he must pursue his claims under § 2255. With one possible exception, all of the issues that Mr. Leland lists in his motion for writ of audita querela and his motion for reconsideration are equitable, were available to him at the time of sentencing, and could have been presented either to

---

[5]     Even if the Court were to conclude that Mr. Leland's claims are cognizable under § 2255, Mr. Leland has already filed multiple § 2255 petitions, and to the extent that he wishes to file a successive petition, he must first obtain approval from the First Circuit. *See* 28 U.S.C. § 2255(h).

the Court of Appeals on direct appeal or to this Court and the Court of Appeals under his § 2255 petition.[6]

As of October 2005 or shortly thereafter, Mr. Leland was aware: (1) that the Court, not a jury, had made the Guideline determinations; (2) that he maintained that he had not sent the investigative material to Mr. Dunroe, (3) that he contended he had entered into a so-called oral plea agreement, (4) that he thought his first lawyer had been ineffective, (5) that he thought his second lawyer had been ineffective, (6) that he believed the Court had relied on the PSR to make factual findings, (7) that he believed the Court had failed to adequately explain its rulings, (8) that the prosecutor had told the Court that the Government was not seeking the obstruction of justice enhancement, (9) that in his view, the Court had ruled on issues not raised by the parties, (10) that in his view, sharing investigative material with a third person is not obstruction of justice, and (11) that he said he did not know about the obstruction of justice possibility until the sentencing hearing.

Here, Mr. Leland points to nothing occurring "subsequent to the conviction" that would render it illegal, thus rendering his petition and motion eligible for dismissal under audita querela on that basis alone. *See Holder*, 936 F.2d at 5. Whatever else may be said about these issues, Mr. Leland knew about them a long time ago and nearly fifteen years after his sentence, he demands that the Court rule

---

[6]     The only possible exception is his later procuring of the affidavits from Mr. Dunroe and others about the dissemination of investigative material, which the Court separately addresses.  But Mr. Leland's "'4' four sworn affidavits" supposedly "proving he did not commit what the court said he did, which was Obstruction of Justice" are new facts, not new law, and the Supreme Court and the First Circuit require new law for a writ of audita querela.  *Morgan*, 346 U.S. at 511; *Hager*, 993 F.2d at 5.

on them pursuant to a petition for a writ of audita querela.  None of the issues he raises presents the Court with law that has changed since his sentencing.

Nevertheless, because Mr. Leland is a pro se defendant, the Court considers his claims as if filed as a petition for a writ of coram nobis, which was available at common law to correct errors of fact, *see United States v. Morgan*, 346 U.S. 502, 507 (1954)..

> Addressing coram nobis, the First Circuit set forth the applicable standards:
>
> [T]he writ of coram nobis is an unusual legal animal that courts will use to set aside a criminal judgment of conviction only "under circumstances compelling such action to achieve justice."

*Hager v. United States*, 993 F.2d 4, 5 (1st Cir. 1993) (quoting *Morgan*, 346 U.S. at 511).  The *Hager* Court explained:

> Those circumstances include an explanation of why a coram nobis petitioner did not earlier seek relief from the judgment, a showing that the petitioner continues to suffer significant collateral consequences from the judgment, and a demonstration that an error of "the most fundamental character," relevant to the plea decision, occurred.

*Id.* (quoting in part *Morgan*, 346 U.S. at 512); *Manjarres*, 2010 U.S. Dist. LEXIS 36214, at *14.

The Court accepts for purposes of this Order that Mr. Leland is suffering "significant collateral consequences" from the errors he contends the Court has made. It turns therefore to whether these purported errors were in fact errors at all, much less errors of "a fundamental character."  *Id.*

## B.    Claimed Errors

### 1.    The Role of the Judge in Guideline Findings

In his motion, Mr. Leland says that "the Sixth Amendment requires juries, not judges, to find facts relevant to sentencing." *Def.'s Pet.* at 2. He is wrong. The Supreme Court has determined that juries, not judges, must find facts relevant to the application of a statutory maximum and a statutory minimum. *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (statutory maximum); *Alleyne v. United States*, 133 S. Ct. 2151 (2013) (statutory minimum). The basis of the Supreme Court's rulings is that "any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Butterworth v. United States*, 775 F.3d 459, 462 (1st Cir. 2015) (quoting *Alleyne*, 133 S. Ct. at 2155). The First Circuit has distinguished jury findings that determine statutory maximums and minimums from judicial findings that determine the application of provisions of advisory Guideline provisions. *United States v. Correy*, 773 F.3d 276, 280 n.4 (1st Cir. 2014) ("[F]actual findings made for purposes of applying the Guidelines, which influence the sentencing judge's discretion in imposing an advisory Guidelines sentence and do not result in the imposition of a mandatory minimum sentence, do not violate the rule in *Alleyne*").

### 2.   Claimed Surprise and Due Process Deprivation

Mr. Leland's next contention is that he was "deprived of his right to <u>Due Process</u> when the court surprised him and the prosecutor when he was charged with the crime of Obstruction of Justice at his sentencing. Petitioner was not allowed to

defend himself against these charges. The prosecutor objected, but the court wouldn't listen." *Def.'s Mot.* at 2 (emphasis in Defendant's motion). This is simply not correct.[7]

> The PSR contained the following statement in paragraph 60:

> In March 2004, following his guilty plea, defendant Leland wrote a letter to members of the Hell's Angels noting his desire to cause bodily injury to codefendant, Robert Stewart, as Stewart provided incriminating information to authorities regarding Leland. Therefore, the defendant, directly or indirectly, attempted to threaten, intimidate or otherwise unlawfully influence a codefendant or witness. Further, in March 2004, defendant Leland disseminated discovery material to others, including prison inmates, known felons in the community and other Hell's Angels.

PSR ¶ 60. In the PSR, the PO recommended application of the two-level obstruction of justice enhancement. *Id.* ¶ 70. The PSR confirmed that Mr. Leland objected to the application of the obstruction of justice enhancement. *Id.; Second Addendum to the PSR* dated October 19, 2005 at 2.

On October 24, 2005, the Court held a presentence conference with counsel, including Mr. Leland's new lawyer, Robert Napolitano, to discuss issues likely to come up at Mr. Leland's sentencing. *Presentence Conf. Tr.* at 1-31. Contrary to Mr. Leland's contention that the obstruction of justice enhancement first arose at the sentencing hearing itself, the PO's recommendation of an obstruction of justice enhancement was a primary issue under discussion at the Presentence Conference.

---

[7]    Mr. Leland is correct only about the allegations involving Omar and Don Grace. These allegations arose after the presentence conference. But he is simply incorrect that the possibility of an obstruction of justice enhancement arose for the first time at the sentencing hearing. The record reflects that the Court engaged in a detailed discussion about the possibility of an obstruction of justice enhancement at the presentence conference before the sentencing hearing based on the contents of the revised PSR, which itself had been available before the presentence conference.

*Id.* at 5:25-9:3.  At the Presentence Conference, the Court characterized the parties'

positions:

> THE COURT:
>
> Let's turn to the next question here, and let me be - - let me try and
> understand what remains in terms of the objections and what doesn't.
> Under the terms of the presentence investigation report, there has been
> a recommendation that an obstruction of justice enhancement apply to
> Mr. Leland on two bases: First, a letter that he wrote about Robert
> Stewart, a codefendant; and second, an allegation that he disseminated
> discovery that had been provided to him by the government prior to trial
> and prior, obviously, to the plea.
>
> The defendant, as I understand it, has objected to the application of the
> obstruction of justice enhancement on two grounds: First, that the letter
> about Mr. Stewart is not as some would interpret it to be; and, secondly,
> that he didn't disseminate discovery, rather, the discovery was stolen
> from his cell.
>
> And the government, as I understand it, has taken the position that
> under the terms of its plea agreement it cannot argue for obstruction.
>
> Have I correctly stated the positions of the parties?
>
> MR. NAPOLITANO: Yes - -
>
> MR. PERRY: That's correct, Your Honor.
>
> MR. NAPOLITANO: - - at least that's my position.

*Id.* at 5:25-6:21.  The Court informed counsel that if Mr. Leland objected to the

contents of the PSR either regarding the letter about Mr. Stewart or the

dissemination of discovery, the Court "will have no factual basis upon which to make

a decision about obstruction unless somebody presents evidence to me."  *Id.* at 7:18-

24.  Mr. Napolitano confirmed that "that would be his position."  *Id.* at 7:25.

To place the parties' positions into context, the Government entered into a Plea Agreement with Mr. Leland, which in Section Three contained a number of agreements about what the Government would recommend to the Court at the sentencing hearing. *Plea Agreement* at 4-5. The Plea Agreement also specifically provided that "[t]he parties agree not to seek any further additions or reductions to the guidelines, other than those set forth in section Three. The parties agree not to seek nor recommend any upward or downward departures." *Id.* at 5. At the Presentence Conference, AUSA Perry indicated to the Court that the Government viewed the Plea Agreement as prohibiting its support of the PO's obstruction of justice enhancement. *Presentence Conf. Tr.* at 7:11-12 ("Under the terms of the plea agreement, we are not advocating that obstruction . . . .").

In light of the Government's position, the Court raised the question of how it could rule on the applicability of the obstruction enhancement if Mr. Leland, which he promised to do, objected to the contents of the PSR. *Id.* at 7:16-24 (THE COURT: "I don't know what the facts are, and I - - if Mr. Leland at the time of sentencing says, look, I don't agree with the terms - - what is contained in the presentence investigation report regarding either the letter to Mr. Stewart - - about Mr. Stewart or the dissemination of discovery, then I will have no factual basis upon which to make a decision about obstruction unless somebody presents evidence to me"). AUSA Perry said that he needed time to "mull over" the Government's position on whether it could present evidence on obstruction of justice to the Court at the sentencing hearing without violating the terms of the Plea Agreement. *Id.* at 8:19-21.

35

At the sentencing hearing, AUSA Perry observed that paragraph five of the Plea Agreement allowed the Government to present evidence to the Court, if the Court requested it and therefore, he proceeded to move a series of exhibits into evidence concerning the PO's obstruction of justice enhancement. *Sentencing Tr.* at 56-60. Mr. Leland's counsel did not object to the admission of any of the Government's exhibits. *Id.* at 59-60. After the Government's exhibits were admitted into evidence, the Court specifically asked Mr. Leland's counsel whether he had anything further on this issue and Attorney Napolitano responded: "No, your Honor, not at this time." *Id.* at 60. The Court reviewed the admitted exhibits, the standards for an obstruction of justice enhancement, and found that Mr. Leland had obstructed justice under USSG § 3C1.1. *Id.* at 60-68.

The recited record conclusively demonstrates that Mr. Leland's allegations concerning the obstruction of justice enhancement are false. Contrary to his assertion, Mr. Leland's counsel had prior notice of the PO's obstruction of justice recommendation in the PSR and, at the Presentence Conference, the Court brought this issue to the attention of Attorney Napolitano and discussed with counsel how they wished to proceed. Contrary to Mr. Leland's assertion, the prosecutor had been placed on notice of the potential for an obstruction of justice enhancement, had considered how to respond to the PO recommendation, and had presented evidence of the facts underlying the recommendation at the sentencing hearing. Contrary to Mr. Leland's assertion, the Court did not refuse to allow Mr. Leland to defend himself. In fact, the Court specifically asked Attorney Napolitano whether he had anything to

36

present on the obstruction of justice issue and Attorney Napolitano declined to present any evidence.  Contrary to Mr. Leland's assertion, the prosecutor did not object to the enhancement.  Bound by the terms of the Plea Agreement not to seek the enhancement, AUSA Perry was careful to confirm that the Government was not asking the Court to impose the enhancement, but AUSA Perry never objected to the Court's imposition of the enhancement.  Finally, contrary to Mr. Leland's assertion, the Court never refused to listen to the prosecutor or to defense counsel on the obstruction of justice issue.  In fact, the Court solicited argument both from the Government and from defense counsel and both declined.  Furthermore, while the Court was announcing its decision, both the prosecutor and defense counsel interrupted the Court and in one case, corrected one of the Court's observations, and in another case, argued for a different interpretation of the facts.  Mr. Leland's accusation that the Court "wouldn't listen" is false.

### 3.    The Oral versus Written Plea Agreement

In his petition and motion, Mr. Leland draws a distinction between an oral and written plea agreement.  *Def.'s Pet.* at 6 ("Petitioner agreed to plead guilty in an <u>oral</u> plea agreement on October 27, 2005 after 2 years and 7 months in custody") (emphasis in original); *Id.* at 8 ("The oral and written plea agreements are different").  He says that during his discussions with AUSA Perry leading up to his agreement to plead guilty, AUSA Perry made all manner of promises, including that he would receive a sentence of only ten years and that the federal prosecutor would not indict

his son, Derek Leland. *Id.*. Mr. Leland also accuses his then defense counsel, Christopher Largay, of deceiving him. *Id.* at 9.

The Court rejects Mr. Leland's claims. Mr. Leland's claims of side agreements with the prosecution run counter to the express terms of the Plea Agreement itself:

> 12. Defendant understands that there are no further or other promises or agreements, either express or implied, other than those contained in this Agreement and that none will be made except in writing signed by all parties.

*Plea Agreement* at 7. Furthermore, Mr. Leland affirmatively represented to the Court that he had read the Agreement, that he understood the contents of the Agreement, that he had signed the Agreement voluntarily, and that in signing the Agreement, he intended to agree to all its terms and conditions. *Rule 11 Hr'g* at 19:6-20:3. Moreover, the Court expressly asked Mr. Leland whether the federal prosecutor had made any side agreements and Mr. Leland assured the Court that aside from the written plea agreement, no one had made any promises to him in an effort to get him to plead guilty and no one had made any promises to him as to what the prosecutor's recommendation would be at sentencing. *Id.* at 25:3-6, 10-17.

During the Rule 11 hearing, the Court repeatedly told Mr. Leland that he had to tell the Court the truth. Mr. Leland is now alleging that the federal prosecutor supposedly made promises to Mr. Leland that Mr. Leland failed to mention at the Rule 11 hearing and his current assertions run flatly contrary to what Mr. Leland repeatedly told the Court was true on January 27, 2004. Put differently, either Mr. Leland was not telling the truth to the Court then or he is not telling the truth to the Court now.

The reason that the Court engages in a detailed and extensive colloquy with each defendant who is pleading guilty, including Mr. Leland, is to make absolutely certain that the defendant's guilty plea is knowing and voluntary. To make that assessment, the Court must rely on a defendant telling the Court the truth at the time of the guilty plea; specifically at each Rule 11, the Court focuses on whether there are any side deals that could affect the legality of the guilty plea. Faced with an irreconcilable conflict between what Mr. Leland told the Court was true while standing before the Court on January 24, 2007 and what Mr. Leland is now telling the Court is true having received his sentence, there is no reason to conclude that Mr. Leland has demonstrated that his current version is true. The Court rejects Mr. Leland's contentions that there were side deals with the prosecutor and relies on what Mr. Leland himself told the Court was true when he entered his guilty plea and what Mr. Leland himself assured the Court was true about the Plea Agreement.

### 4.     Judicial Reliance on the Contents of the PSR

In his petition, Mr. Leland instructs the Court that once "a defendant objects to factual statements in the PSR [as Petitioner did about threatening a codefendant and sending six pages of discovery to Thomas Dunroe], then the sentencing court may not rely on those assertions; instead the government must prove them by a preponderance of the evidence." *Def.'s Pet.* at 14 (quoting *United States v. Replogle*, 628 F.3d 1026, 1029 (8th Cir. 2011) (emphasis added by Mr. Leland)).

First of all, the Eighth Circuit case of *Replogle* does not represent the law of the First Circuit. Under First Circuit law, a "PSR generally bears 'sufficient indicia

of reliability to permit the district court to rely on it at sentencing." *United States v. Prochner*, 417 F.3d 54, 65-66 (1st Cir. 2005) (quoting *United States v. Cyr*, 337 F.3d 96, 100 (1st Cir. 2003)). Although a defendant may object to the contents of the PSR, "if [his] objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR." *Id.* at 66 (quoting *Cyr*, 337 F.3d at 100). In the First Circuit, "[s]pecial weight is given to those portions of the PSR to which no countervailing proof is offered." *United States v. Sicher*, 576 F.3d 64, 71 (1st Cir. 2009). Here, Mr. Leland offered no countervailing proof to the contents of the PSR regarding his letter about Mr. Stewart and regarding the discovery found by law enforcement in Mr. Dunroe's home. Therefore, the Court was entitled to accept the facts in the PSR under First Circuit law.

But more to the point, the Court did precisely what Mr. Leland now contends it should have done. At the Presentence Conference, even though it could have relied on the contents of the PSR absent countervailing evidence from Mr. Leland, the Court informed counsel that if Mr. Leland objected to the contents of the PSR either regarding the letter about Mr. Stewart or the dissemination of discovery, the Court "will have no factual basis upon which to make a decision about obstruction unless somebody presents evidence to me." *Presentence Conf. Tr.* at 7:18-24. Therefore, at the sentencing hearing, the Government presented the Court—without objection from Mr. Leland—with a series of exhibits that were admitted into evidence and that addressed the facts underlying the PO's recommendation that the Court impose an obstruction of justice enhancement. *Sentencing Tr.* at 56-60. The Court reviewed

40

those exhibits and made factual findings that substantiated the imposition of an obstruction of justice enhancement. *Id.* at 60-68. As the Court complied to the letter with what Mr. Leland now says it should have done, he gains nothing from his objection.

### 5.   Inadequate Enhancement Findings and Inadequate Evidence

For the first time in this long saga, Mr. Leland claims that the Court's findings respecting the factual requirements for the obstruction of justice findings were insufficient. *Def.'s Pet.* at 14-16. The Court rejects this belated complaint. The Court's discussion of the obstruction of justice enhancement runs eight pages. *Sentencing Tr.* at 60-68. The Court reviewed the exhibits that the Government moved into evidence, quoted USSG § 3C1.1, read the Commission commentary to this provision, and cited First Circuit caselaw in arriving at its conclusion. *Id.* The Court rejects Mr. Leland's contention that its discussion of the obstruction of justice enhancement was inadequate.

Mr. Leland asserts that "[t]he Court admits in the sentencing transcripts on page 57, lines 5 through 11 and again on page 60, lines 19 through 22, and for a third time on page 66, lines 7 & 8, that there is no evidence to support the two (2) point level enhancement." *Def.'s Pet.* at 16. At page 57, however, the Court was referring to the fact that, as the Court told counsel at the presentence conference, before the Government admitted its exhibits into evidence, the only document before the Court was the PSR and if Mr. Leland objected to the admission of the exhibits, the Court would have no basis to make factual findings. *Sentencing Tr.* at 57 ("On the other

hand, the Court doesn't have any actual information other than what is set forth in the Presentence Investigation Report, and it is important for its own determination as to whether an obstruction of justice charge enhancement should be applied in this case to obtain the information that is appropriate.  So with that understanding, you may proceed").  Directly after this comment, the Government moved into evidence numerous underlying exhibits on which the Court relied in imposing the enhancement.  *Id.* at 58-60.  Here, the Court was only stating what Mr. Leland earlier said it should have stated: that if objected to, the Court would not rely on the contents of the PSR alone in imposing the enhancement and would require actual evidence, which the Government then supplied.

The colloquy on page 60 relates to the Court's clarification about an assertion in the PSR, namely that "David", the recipient of the Leland letter about Robert Stewart, was a member of the Hells Angels.  *Id.* at 60.  AUSA Perry and Attorney Napolitano informed the Court that "David" was not a member of the Hells Angels and that the Court should not draw that inference from the Leland letter.  *Id.* at 60-61.  The Court agreed not to do so.  *Id.* at 61 ("All right.  So I can't make that inference").  Contrary to Mr. Leland's contention, the Court did not state on page 60 of the sentencing transcript that it had no evidence of obstruction of justice; the Court merely established with counsel what fair inferences it could draw from the evidence that was before the Court.  Once counsel agreed that the Court should not infer that "David" was a member of the Hells Angels, the Court agreed on the record not to draw that inference.

42

The reference on page 66 of the transcript to an absence of evidence bears a word of explanation.  One of the reasons the PO recommended an obstruction of justice enhancement was that investigative papers AUSA Perry sent to Mr. Leland's attorney, Christopher Largay, had been discovered in Thomas Dunroe's Hampden home.  PSR ¶ 60.  In discussing this issue, the Court observed that "the information . . . has found its way to Thomas Dunroe who was under investigation at the time, and during a search of his apartment detailed information of the status of DEA investigations in this area was uncovered." *Sentencing Tr.* at 66.  The Court noted that "[c]learly, whoever sent that information to Mr. Dunroe had the intent to obstruct or interfere with an ongoing governmental investigation . . . ." *Id.*  The Court identified two possible senders, Attorney Largay and Mr. Leland, and commented "I know of no other conclusion I could reach." *Id.*

At that point Attorney Napolitano interrupted and suggested a third possibility: another inmate may have sent the investigative report to Mr. Dunroe.  *Id.* at 66.  Attorney Napolitano agreed that there was no reason to accuse Attorney Largay of supplying Mr. Dunroe with this investigative information.  *Id.*  As a practical matter, this narrowed the possible senders to either Mr. Leland or to some unknown inmate who presumably entered Mr. Leland's cell, stole the papers, and sent them to Mr. Dunroe, who was a possible target of the ongoing investigation.  The Court observed that it was a logical inference that Mr. Leland, who presumably received the reports from Attorney Largay, was responsible for sending them out.  *Id.*

Rejecting Attorney Napolitano's contention that the Court should infer that someone other than Mr. Leland had sent the investigative reports, the Court noted that "I have no evidence one way or the other <u>on that</u>", meaning evidence as to who was the source of the investigative report; to which Attorney Napolitano replied, "That's correct." *Id.* The Court went on to say that it was able to draw an inference from what was before it, that it had given Attorney Napolitano an opportunity to present evidence, but there was "no evidence <u>other than what I have before me</u>," again, referring to the absence of any evidence of another possible culprit. *Id.* (emphasis supplied).

Mr. Leland badly misreads this colloquy. The Court had before it evidence that AUSA Perry had sent sensitive investigative information to Mr. Leland's then attorney and that this information had turned up in Hampden, Maine at the home of a known drug dealer. Once Attorney Largay was eliminated as the sender of the information to Mr. Dunroe, the Court could easily infer that Mr. Leland, the presumed recipient of the information, was the sender.

Against this inference, the Court told Attorney Napolitano that if Mr. Leland wanted the Court to draw a different conclusion, he was free to present any evidence that would tend to show that Mr. Leland was not the actual sender. But Mr. Leland declined to present any evidence on this issue at all. Mr. Leland himself did not deny being the sender at the sentencing hearing. He did not tell the Court that he did not know Thomas Dunroe. He did not tell the Court that others had access to his cell and may have sent out the discovery material. He did not call a prison official to describe

44

access to cells or the prison's mail system. He did not say (and has never said) who was the likely culprit. He did not attempt to call Mr. Dunroe or anyone else to clear up where Mr. Dunroe obtained those documents. At the sentencing hearing, the Court was left with only an attorney's argument, unsupported by any evidence, that speculated that some unknown person, not his client, may have been the source of the investigative material. Given the logical inference that someone who received a package is the most likely person to have forwarded it and in the absence of any countervailing evidence, the Court maintained its finding that it was likely Mr. Leland was the source of the investigative information found in the Dunroe house.

In short, the Court rejects Mr. Leland's contention that during the sentencing hearing, the Court had confessed that it had no evidence of the source of the investigative reports. To be precise, at the sentencing hearing, the Court had evidence that Mr. Leland was the likely source and had no evidence to the contrary.

**6.   The Court as Impartial Arbiter**

In both his petition and his motion for reconsideration, Mr. Leland accuses the Court of violating its obligation to act as an impartial arbiter. *Def.'s Pet.* at 11-12; *Def.'s Mot.* at 1-2. Mr. Leland explains that because "the parties both agreed that the Petitioner should not have received the Obstruction of Justice enhancement", the Court violated the "Neutral Arbiter" rule by imposing an enhancement that the parties agreed should not apply. *Def.'s Pet.* at 11-12.

Mr. Leland's argument on this point reveals a fundamental misunderstanding about the Court's, the parties', and the PO's roles at sentencing. The criminal rules

provide for different types of plea agreements. By far the most commonly used in the District of Maine is found in Rule 11(c)(1)(B), where the parties have the right to make non-binding recommendations to the sentencing judge. FED. R. CRIM. P. 11(c)(1)(B) ("such a recommendation or request does not bind the court"). A second plea agreement that is exceedingly rare in the District of Maine is found in Rule 11(c)(1)(C), where the parties make sentencing recommendations that bind the sentencing judge, if the judge accepts the plea agreement. FED. R. CRIM. P. 11(c)(1)(C). Mr. Leland entered into the first, non-binding type of plea agreement, not the second, binding type of agreement. *Plea Agreement* at 4 ("Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the parties agree to take the following positions at sentencing").

The effect of Rule 11(c)(1)(B) is that the sentencing judge may accept or reject the parties' sentencing recommendations and impose a more severe (or less severe) sentence than the one the parties recommend. Mr. Leland's Plea Agreement makes it abundantly clear that the parties are making recommendations to the Court on sentencing and that their recommendations are not binding on the Court. Each of the sentencing positions on the Guidelines in the Plea Agreement starts with the phrase: "The parties agree to recommend that the Court find . . . ." *Plea Agreement* at 4-5. But any doubt is removed by additional language in Mr. Leland's Plea Agreement:

> The parties expressly agree and understand that these recommendations will not be binding on the Court and should the Court reject the recommendations of the parties, Defendant will not thereby be permitted to withdraw his/her guilty plea. The parties agree and

understand that the Court has the discretion to impose any lawful sentence.

*Plea Agreement* at 5.

To make certain that a defendant understands that the Court retains the discretion to impose a harsher or more lenient sentence than the one recommended by the parties, at the Rule 11 the Court reviews this principle with counsel and the defendant. In Mr. Leland's case, the Court engaged in the following colloquy with counsel:

> THE COURT: Does this plea agreement in any way inhibit my discretion in sentencing, Mr. Perry?
>
> MR. PERRY: It does not, Your Honor.
>
> THE COURT: Mr. Largay?
>
> MR. LARGAY: No, Your Honor.

*Rule 11 Tr.* at 22:10-14. The Court also directly addressed Mr. Leland:

> THE COURT: Now, I also want you to turn, if you would Mr. Leland, to page 4 paragraph 3 of the agreement to plead guilty. Do you see that, sir?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: This contains a number of references to recommendations that the parties agree to make to the court concerning base offense levels and whether the evidence supports a finding of a dangerous weapon possessed in relation to the drug offense, increases in points, acceptance of responsibility, and other matters. Did you review that paragraph before coming to court today?
>
> THE DEFENDANT: Yes, I did.
>
> THE COURT: What I want you to understand Mr. Leland is this. That as far as sentencing is concerned, this plea agreement permits you and your lawyer, Mr. Largay, and the prosecutor to make recommendations

to the court regarding sentencing, but the authority to determine the appropriate sentence in this case rests with me as the judge in this court. Do you understand, sir?

THE DEFENDANT:  Yes, sir.

THE COURT:  If I do not accept the recommendations, even those recommendations that are set forth in paragraph 3, you will have no right to withdraw your guilty plea.  Do you understand?

THE DEFENDANT:  Yes, sir.

*Id.* at 22:20-23:19.

After the guilty plea, the PO performs an investigation and prepares a PSR, which makes recommendations to the Court regarding the Guideline calculations and its sentencing recommendations. FED. R. CRIM. P. 32(d).  In making its Guideline and sentencing recommendations, the PO is not bound by the agreements of the parties, and the parties have a right to object to the PO's recommendations.  FED. R. CRIM. P. 32(g).  The Rule provides that if the sentencing judge is contemplating a possible departure from the sentencing range on a ground not identified by the PO or by the parties, the judge is required to inform the parties.  FED. R. CRIM. P. 32(h).  Although it does not happen that often, occasionally, as in this case, the PO will make a Guideline recommendation to the Court that differs from what the parties have recommended in a plea agreement, and the law contemplates that the Court may hear evidence and must rule on those and other disputes at the sentencing hearing. FED. R. CRIM. P. 32(i)(3).

Here, the Court followed the exact procedure contemplated by the criminal rules.  The PO performed its investigation and recommended that the Court impose

a two-level enhancement for obstruction of justice, the parties were allowed to review the PSR and to object to the PO recommendation, the Court made certain that the parties were aware before the sentencing hearing that it was considering the obstruction of justice enhancement, the parties were given the opportunity to present evidence and to argue the proposed enhancement, and the Court ruled on the enhancement, setting forth in detail its factual and legal findings. There is nothing unusual about this general process and in following this procedure, the Court was not abrogating the right to determine the issues that required resolution. It was complying with standard procedure, where the parties and the PO have the right to present issues for resolution to the Court. None of this should come as a surprise to Mr. Leland because this procedure is explicit in his Plea Agreement and was explained to him during the Rule 11 hearing. The Court rejects his contention that it violated the so-called neutral arbiter rule.

### 7.   The Obstruction of Justice Enhancement

The real source of Mr. Leland's discontent is that he believes the Court unfairly found that he obstructed justice. The Court has repeatedly endeavored to explain to Mr. Leland why it reached this conclusion but without success. It will try again.

There was no indication in either Mr. Leland's January 27, 2004 Plea Agreement or at his January 27, 2004 Rule 11 that he might be subject to a two-level enhancement for obstruction of justice. The Plea Agreement makes no mention of it. *Plea Agreement* at 1-8. It did not come up during his Rule 11. *Rule 11 Tr.* at 1-29.

This is because the conduct that undergirded the obstruction of justice enhancement had either not occurred or not been discovered.

To the Court's knowledge, the first mention of a possible obstruction of justice enhancement appeared in the PSR at paragraph 60:

> In March 2004, following his guilty plea, defendant Leland wrote a letter to members of the Hell's Angels noting his desire to cause bodily injury to codefendant, Robert Stewart, as Stewart provided incriminating information to authorities regarding Leland. Therefore, the defendant, directly or indirectly, attempted to threaten, intimidate or otherwise unlawfully influence a codefendant or witness. Further, in March 2004, defendant Leland disseminated discovery material to others, including prison inmates, known felons in the community and other Hell's Angels.

PSR ¶ 60. The PSR isolates two instances of potential obstruction: the March 2004 Leland letter and the dissemination of discovery. *Id.* These were the issues that the Court raised to the parties at the Presentence Conference on October 24, 2005. *Presentence Conf. Tr.* at 5:25-9:3.

### a.    Robert Stewart

At the sentencing hearing, the Government introduced the letter that Mr. Leland wrote to David in March 2004 and two investigation reports that Mr. Leland attached to that letter. As noted earlier, the letter was in Mr. Leland's handwriting to a man named "David" discussing Robert Stewart, a codefendant and witness against Mr. Leland. *Sentencing Hr'g* at 62-63. Referring to Mr. Stewart, Mr. Leland's letter stated in part:

> Sending some paperwork that you and others in your area will be interested in . . . That bastard has been a rat since 2000. He told a lot of lies about me.

*Id.* at 62. Mr. Leland then referred to a man named Alan McDougal and said:

> Both of them have been rats for a long time . . . The club didn't support me through this because of them, and now the club knows the difference. I hope they come around.  Well, David, I always liked you a lot and wanted you to know what he was.  I pray I meet him in here someday. He thinks he's tough.  I'll show the asshole what tough is.  You take care of yourself.

*Id.*  Mr. Leland signed the letter "Your real friend, Bill Leland, Hells Angels."  *Id.* at 62-63.  Mr. Leland attached seven pages of investigative reports that detailed Mr. Stewart's involvement in the greater conspiracy.  *Id.* at 63.  At the end of the investigative report, Mr. Leland wrote:

> Look at that.  The asshole gave up his in-laws.  What a nice guy.

*Id.*

To place this letter in perspective, Robert Stewart was a codefendant in this case. *Second Superseding Indictment* (ECF No. 60).  On September 24, 2003, a grand jury indicted Mr. Stewart for conspiring with Mr. Leland to distribute cocaine, *id.*at 2 (Count Three), and multiple other drug trafficking counts.  *Id.* at 3-6.  On January 6, 2004 and again on January 22, 2004, the Government filed prosecution versions on Mr. Stewart's case, both of which among other things confirmed that Mr. Stewart had been supplying Mr. Leland with cocaine.  *Gov't's Version of the Offense* at 1 (ECF No. 143) (ECF No. 193).  On January 23, 2004, the Government filed an Agreement to Plead Guilty and Cooperate executed by Mr. Stewart in which Mr. Stewart agreed to testify about his involvement and the involvement of others in the violations of law set forth in the indictment, *Agreement to Plead Guilty and Cooperate* (ECF No. 200), and on the same day, Mr. Stewart pleaded guilty to five drug trafficking counts in the superseding indictment.  *Minute Entry* (ECF No. 203).

51

Jury selection had been scheduled for the case against Mr. Leland for January

29, 2004. *Notice of Hr'g* (ECF No. 198). In the Government's trial brief, it stated:

> The evidence also is expected to show that in approximately January
> 2003, Leland began obtaining cocaine from Robert Stewart for
> distribution. Stewart supplied cocaine to Leland on numerous
> occasions. After one occasion, Leland ruined the cocaine while trying to
> process it. In an attempt to get out of paying for this cocaine, Leland
> devised a story that he lost the cocaine. As a result of his drug dealings
> with Stewart, Leland amassed a debt of approximately $16,000.

*Gov't's Trial Br.* at 5-6 (ECF No. 186). Mr. Leland pleaded guilty on January 27,

2004, four days after Mr. Stewart had pleaded guilty and two days before jury

selection. *Minute Entry* (ECF No. 205). Mr. Leland admitted a prosecution version,

which stated in part:

> The testimony and evidence also would show, in substance, that at least
> from January 2003 through March 2003, this defendant was obtaining
> cocaine from [a] third individual and directly and indirectly distributing
> the cocaine in Maine.

*Gov't's Version of the Offense* at 1 (ECF No. 206). The PSR later details Mr. Stewart's

involvement in Mr. Leland's drug dealing conspiracy. PSR at 15. The upshot is that

Mr. Stewart was a significant potential witness against Mr. Leland: Mr. Stewart had

sold Mr. Leland cocaine, Mr. Leland owed him either $15,000, *id.*, or $16,000 for

cocaine, *Gov't's Trial Br.* at 5-6, Mr. Stewart had pleaded guilty to multiple drug

trafficking counts, including one that alleged he was involved in a drug trafficking

conspiracy with Mr. Leland, and Mr. Stewart was prepared to testify against Mr.

Leland in the upcoming trial. Although Mr. Stewart was not the only reason Mr.

Leland decided to plead guilty, his anticipated testimony against Mr. Leland would

have been compelling evidence and must have contributed to Mr. Leland's decision to

plead guilty.  Mr. Leland had every reason to be upset with Mr. Stewart and as Mr. Leland's March 2004 letter establishes, he was.

During the sentencing hearing, the Court reviewed the obstruction of justice provision of the Guidelines:

> If (1) the defendant willfully obstructed or impeded or attempted to obstruct of impede the administration of justice during the course of the investigation, prosecution or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

*See Sentencing Tr.* at 61 (quoting USSG § 3C1.1).   The Court turned to the commentary to § 3C1.1 and observed that the United States Sentencing Commission lists the following examples of obstruction of justice:

> [T]hreatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness or juror, directly or indirectly, or attempting to do so[.]

USSG § 3C1.1, n.4(A).  The Court reviewed the decisions of other courts and noted that in 1997, the First Circuit held in *United States v. McMinn*, 103 F.3d 216 (1st Cir. 1997) that threatening letters to a prospective witness constituted obstruction of justice.  *Sentencing Tr.* at 64.  The Court also cited *United States v. Bush*, a Third Circuit case, for the same conclusion, where a defendant threatened a prosecutor and another person.  *Id.*

At the sentencing hearing, the Court concluded that Mr. Leland's letter constituted a threat against Mr. Stewart, who had been a potential witness against him.  *Id.* at 64-65. The Court noted that the threat was of particular concern because Mr. Leland later filed a motion to withdraw his guilty plea and, if that motion had

53

been successful, the Government would likely have called Mr. Stewart as a witness. *Id.* at 65. As the Court has previously explained, based on the threat alone, the Court did and would have imposed the obstruction of justice enhancement in Mr. Leland's case. *See Order Denying Mot. for Relief from Final J. under Rule 60(b)/(d)* at 2-5 (ECF No. 371).

In his petition, Mr. Leland lists five reasons that the Court erred when it imposed the two-level obstruction of justice enhancement for the Stewart letter: (1) the sentencing judge "claims Petitioner sent a letter to a Hells Angel threatening Robert Stewart"; (2) Mr. Leland wrote the letter to David, a friend of his, because David had been told that Robert Stewart was going to harm Mr. Leland and Mr. Leland had "gotten a beating while a federal detainee at the Maine State Prison because Robert Stewart told people that Petitioner was a rat"; (3) Mr. Leland "knew Stewart was in federal prison in Raybrook, NY and could have gotten word to inmates at that prison that Stewart co-operated with the government and told on many people", but Mr. Leland "never told anyone and Stewart did his time and was released"; and (4) three people visited Mr. Stewart on December 17, 2011 and Mr. Stewart assured them that he had never been threatened by Mr. Leland; and (5) Mr. Leland "never threatened Robert Stewart or told anyone else to hurt him". *Def.'s Pet.* at 7.

Regarding the first issue—that the sentencing judge wrongfully assumed that David was a member of the Hells Angels, the Court earlier addressed this contention and it is simply incorrect. What actually happened is that the Court asked counsel

whether it could "infer that David in the letter . . . is a member of the Hell's Angels." *Sentencing Tr.* at 60. In response, AUSA Perry and Attorney Napolitano informed the Court that "David" was not a member of the Hells Angels and that the Court should not draw that inference from the Leland letter. *Id.* at 60-61. The Court agreed not to do so. *Id.* at 61 ("All right. So I can't make that inference").

Regarding the second issue—that Mr. Stewart had threatened Mr. Leland and that Mr. Leland had been beaten in Maine State Prison because Mr. Stewart had falsely told other people that Mr. Leland had cooperated with the Government, this explanation only serves to further illuminate why Mr. Leland was angry with Mr. Stewart and why Mr. Leland threatened him. Mr. Leland's effort to excuse his threat is unavailing.

Regarding the third issue—that Mr. Leland knew where Mr. Stewart was incarcerated and could have but did not cause him harm while Mr. Stewart was in jail, this has nothing to do with the imposition of the obstruction of justice enhancement at the time of Mr. Leland's sentencing. Although the Court is pleased that Mr. Leland did not later actually beat Mr. Stewart or order his beating, the obstruction of justice enhancement is applicable to a threat against a witness. The fact the threat was never carried out does not diminish its potential impact or negate the application of the enhancement. USSG § 3C1.1, n. 4(A) ("threatening . . . a co-defendant, witness . . . or attempting to do so").

The same logic applies to the fourth issue—the three witness affidavits that Mr. Leland attached to his petition. Again, the Court is pleased that Mr. Leland

never actually beat Mr. Stewart and Mr. Stewart was never aware that Mr. Leland had made the threat. But the issue is not whether the threat was effective; the issue was whether the threat was made, and it was. *United States v. Trinidad-Acosta*, 773 F.3d 298, 317-20 (1st Cir. 2014) (rejecting argument that a threat against a potential witness to a third party is not obstruction of justice).

Finally, the Court rejects Mr. Leland's assertion that he "never threatened Robert Stewart or told anyone else to hurt him." *Def.'s Pet.* at 7. In the March 2004 letter to David, Mr. Leland calls Mr. Stewart a "rat" and a "bastard". He accuses Mr. Stewart of telling "a lot of lies about me." He encloses investigative information that confirms that Mr. Stewart cooperated with the Government. He ends by saying: "I pray I meet him in here someday. He thinks he's tough. I'll show the asshole what tough is." No matter what Mr. Leland now says, that is a threat. Also, sending investigative information about a cooperating codefendant to a third party confirms the witness's cooperation and invites retribution.

Mr. Leland has never really explained why he wrote this letter to David, a person Mr. Leland describes as a friend. To this day, (other than knowing who David is not—namely, he is not a Hells Angel), the Court does not even know who David is, what David's last name is, where David lives, and what, if any, relationship he has had to this case. Nearly ten years after his sentencing, Mr. Leland makes the belated assertion that the reason he wrote the letter to David and enclosed investigative information about Robert Stewart was that Mr. Stewart had falsely claimed that Mr. Leland was a cooperator and, as a result, Mr. Leland had received a jailhouse beating

due to Mr. Stewart's false accusation.  Why it was necessary to tell David, who presumably was not in jail, that Mr. Stewart was a rat, a liar and a bastard, to provide documentary evidence to David confirming that Mr. Stewart had cooperated with the Government, and to assure David that if Mr. Leland met Mr. Stewart in prison, he would assault Mr. Stewart remains a mystery to this day.  But none of this changes the plain fact that Mr. Leland threatened Mr. Stewart in his March 2004 letter and thus merited an obstruction of justice enhancement on that basis alone.

The Court's conclusion is consistent with other cases where courts have held that if a defendant threatens a witness, the defendant merits an obstruction of justice enhancement.  *See Trinidad-Acosta*, 773 F.3d at 317-20 (affirming obstruction of justice enhancement for threat against prospective government witness); *United States v. McMinn*, 103 F.3d 216, 218-19 (1st Cir. 1997) (affirming obstruction of justice enhancement for letters threatening a prospective government witness); *United States v. Lagasse*, 87 F.3d 18, 23-24 (1st Cir. 1996) (affirming obstruction of justice enhancement where defendant called a witness a "rat" and assaulted him in prison); *United States v. Sabatino*, 943 F.2d 94, 100-02 (1st Cir. 1991) (affirming obstruction of justice enhancement where defendant said that a witness would "end up taking a one-way walk through the woods" and another witness would "get his"); *United States v. Belskis*, 477 F. Supp. 2d 237, 245-46 (D. Me. 2007) (imposing obstruction of justice enhancement where defendant accused a witness of being a DEA agent and said "You are all going to fucking get it").

### b.    Thomas Dunroe

For some time, Mr. Leland has been obsessed with the Thomas Dunroe incident where investigative reports that AUSA Perry sent to Attorney Largay, Mr. Leland's then lawyer, were found in Thomas Dunroe's Hampden home.[8]  This Court has explained to Mr. Leland on more than one occasion that his written threat against Robert Stewart was enough by itself to impose the obstruction of justice enhancement.   Even if Mr. Leland were able to convince the Court that he had nothing to do with Mr. Dunroe's possession of the investigative reports, it would not matter.  The threat against Mr. Stewart was and is enough:

> Regarding the second point, however, Mr. Leland tenaciously holds to the belief that the reason he received an enhancement for obstruction of justice and denial of acceptance was solely because of the discovery documents that law enforcement found in the Hampden, Maine home of Thomas Dunroe.  Mr. Leland has presented an affidavit from Thomas A. Dunroe stating that he does not know Mr. Leland, has never talked to him, never corresponded with him, never received anything in the mail from him, and does not know what he looks like.  *Def.'s Mot., Aff. of Thomas Dunroe* Attach. 1.  With this evidence, which is consistent with his earlier factual representations, Mr. Leland seeks reconsideration of the Court's sentencing decision to impose a two-level increase for obstruction of justice and to deny a three-level reduction for acceptance of responsibility.

> So that it is clear.  The Court did not impose the two-level enhancement under U.S.S.G. § 3C1.1 primarily because of the information found in Mr. Dunroe's Hampden home.  At the October 27, 2005 sentencing, the Government introduced into evidence a letter written in Mr. Leland's hand to a man named "David."  *Tr. of Sentencing Hearing* at 59 (Docket # 339).  In the letter dated March 2004, Mr. Leland states that he is enclosing some "paperwork that you and others in your area will be interested in."  *Id.* at 62.  He refers specifically to Robert Stewart and says that "[t]hat bastard has been a rat since 2000.  He told a lot of lies

---

[8]      In his motion for reconsideration, Mr. Leland asserts that he "submitted caselaw that states that informing someone that they are under investigation is not Obstruction of Justice."  *Pet'r's Mot. for Recons.* at 2.  The Court scrutinized Mr. Leland's petition and could find no such cited authority and doubts that it exists.

about me." *Id*. He also mentions an Alan McDougal and writes that "[b]oth of them have been rats for a long time." *Id*. He writes:

The club didn't support me through this because of them, and now the club knows the difference. I hope they come around. Well, David, I always liked you a lot and wanted you to know what he was. I pray I meet him in here someday. He thinks he's tough. I'll show the asshole what tough is.

*Id*. It was signed: "Your real friend, Bill Leland, Hells Angels." *Id*.

Attached to the March 2004 letter was a report of an investigation that detailed in a total of seven pages, Mr. Stewart's role in the drug distribution conspiracy. *Id*. at 63. At the end of the report, a comment appears in Mr. Leland's handwriting: "Look at that. The asshole gave up his in-laws. What a nice guy." *Id*.

The Court found that Mr. Leland's March 2004 letter to "David" amounted to a threat against Robert Stewart. *Id*. at 64-65. On September 26, 2003, a federal grand jury charged that Robert Stewart had conspired with Mr. Leland to engage in a drug dealing conspiracy. *Second Superseding Indictment at 2-3* (Docket # 60). On January 21, 2004, as trial approached for Mr. Leland, the Government revealed that its case against Mr. Leland included evidence that Mr. Stewart supplied cocaine to Mr. Leland for distribution. *Gov't's Trial Br*. at 5-6 (Docket # 186). On January 23, 2004, Mr. Stewart pleaded guilty. *Minute Entry* (Docket # 203). With trial scheduled to start on January 29, 2004, Mr. Leland pleaded guilty to seven counts in the Second Superseding Indictment on January 27, 2004. *Minute Entry* (Docket # 205).

Comment four to U.S.S.G. § 3C1.1, the obstruction of justice enhancement, expressly states that the provision applies to "threatening, intimidating or otherwise unlawfully influencing a co-defendant [or] witness,… directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 Comment 4(a). The First Circuit has observed that "threatening letters" sent to "a prospective government witness" can constitute obstruction of justice within the meaning of § 3C1.1. *United States v. McMinn*, 103 F.3d 216, 218-19 (1st Cir. 1997). It has upheld an obstruction of justice enhancement when a defendant characterized another prisoner -- just as Mr. Leland characterized Mr. Stewart -- as a "rat," *United States v. Lagasse*, 87 F.3d 18, 23-24 (1st Cir. 1996), and when a defendant told a witness she would "end up taking a one-way walk through the woods." *United States v. Sabatino*, 943 F.2d 94, 100-01 (1st Cir. 1991). This Court has applied the same enhancement in

59

similar situations. *See United States v. Belskis*, 477 F. Supp. 2d 237, 246-47 (D. Me. 2007).

The Court considered Mr. Leland's threatening letter to Mr. Stewart to be particularly egregious because it contained both a direct and indirect threat against a central witness and co-defendant. Mr. Leland's later motion to withdraw his guilty plea increased the risk that if the motion had been successful and the threat had been carried out or even communicated to Mr. Stewart, the Government could have been deprived of Mr. Stewart's testimony at a later trial. Mr. Leland's direct threat against Mr. Stewart and his decision to let "David" and people "in [his] area" know about Mr. Stewart, *Sentencing Tr.* at 62, compelled the application of § 3C1.1. The Court's imposition of an obstruction of justice enhancement also resulted in its decision to deny a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. *See* U.S.S.G. 3E1.1, Comment 4 (stating that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct").

Mr. Leland's threat to Mr. Stewart in his own handwriting was the primary basis for the obstruction of justice enhancement and the denial of acceptance of responsibility. Mr. Leland's other actions, including the Dunroe papers, were cumulative. Thus, even if the Court concluded that Mr. Leland is correct that he had nothing to do with appearance of the papers in Mr. Dunroe's house, the sentencing result for Mr. Leland would be unchanged.

This is the last time the Court will explain this in writing. It is done all it can do to set the record straight; yet, Mr. Leland keeps filing the same motion, earnestly repeating his contention about the Dunroe papers. The Court remains convinced that Mr. Leland knows full well that he was very angry with Mr. Stewart and that he threatened to harm him. Mr. Leland must also know that his threat was distinctly unwise because consistent with the Sentencing Guidelines and First Circuit authority, the Court did what it would do in any other similar case: it imposed a higher sentence against Mr. Leland. The law simply does not allow defendants who are awaiting sentence to write out threats against central witnesses and the law extracts an additional punishment against those who do so. Once again, the Court remains encouraged by Mr. Leland's assurances that he has changed his ways and now stands ready to live a productive and law-abiding life. However, as the Court wrote earlier, his rehabilitation will have to be its own reward.

> In short, for the last time, the Court cannot grant Mr. Leland's repeated motions because it does not have the authority to change his sentence and because if it could, it would not.

*Order Denying Mot. for Relief from Final J. Under Rule 60(b)/(d)* at 2-6 (ECF No. 371).

Furthermore, at the sentencing hearing, the evidence demonstrated that the investigative material in Mr. Dunroe's house had been forwarded by AUSA Perry to Mr. Leland's then attorney, Christopher Largay. The Court assumed without dispute that Attorney Largay had not spread this confidential material around the Bangor area. Instead, it was logical that Attorney Largay sent this investigative material to Mr. Leland and, once in Mr. Leland's possession, the investigative material had found its way to Mr. Dunroe's Hampden, Maine residence. Once the Court reached the conclusion that the material was likely the same material that Attorney Largay had sent Mr. Leland, the Court inferred that Mr. Leland was responsible for its safekeeping. There were at least four possibilities: (1) that Mr. Leland deliberately sent the material to Mr. Dunroe, (2) that Mr. Leland deliberately sent the material to someone who then shared it with Mr. Dunroe, (3) that Mr. Leland deliberately allowed someone in the jail to take the material and disperse it, or (4) that someone in the jail stole the material from Mr. Leland without his knowledge or consent and sent it to Mr. Dunroe or someone else, who then sent it to Mr. Dunroe.

Mr. Leland has repeatedly pointed to a February 9, 2009 affidavit signed by Thomas Dunroe that Mr. Leland claims exonerates him from being the source of the dissemination of the investigative material. The Dunroe affidavit states (1) that Mr.

Dunroe does not know Mr. Leland, and (2) that Mr. Leland did not mail him anything, including the investigative material. *Pet'r's Mot.* Attach. 3 *Aff. of Thomas Dunroe* at 1-2.[9] Even if accepted, Mr. Dunroe's affidavit eliminates only the possibility that Mr. Leland directly sent the material to Mr. Dunroe. The other alternatives remain viable: (1) that Mr. Leland deliberately sent the material indirectly to Mr. Dunroe, (2) that Mr. Leland deliberately sent material to someone other than Mr. Dunroe and that it ended up with Mr. Dunroe, (3) that Mr. Leland allowed someone to take the material and that person sent the material to Mr. Dunroe or to a third party, or (4) that someone took the material from Mr. Leland's cell without his consent and sent it to Mr. Dunroe or to a third party who sent it to Mr. Dunroe.[10] Mr. Dunroe never mentions in his affidavit where he got the material.

At the sentencing hearing, Mr. Leland elected to remain silent on this issue. He did not address the Dunroe material during his allocution and he presented no evidence at all on the issue, no witnesses, no documents indicating that he had complained of the theft to prison authorities, nothing. The Court had evidence from Mr. Leland's letter to "David" that Mr. Leland was disseminating investigative material to third parties and from Mr. Leland's letter to his son Derek that he was sending "stuff" about Omar and Don Grace to someone at Maine State Prison in violation of prison policy. Therefore, his dissemination of investigative material

---

[9]     As noted earlier, there are oddities about the two Dunroe affidavits that give the Court considerable pause. *See supra* note 1.

[10]     In a motion filed on September 24, 2008, Mr. Leland implied that a man named Lance Palmer sent the investigative material to Mr. Dunroe. *Def. William Leland's Pro Se Mot. for Sentence Reduction* at 5 (ECF No. 350). He does not reassert this claim in the pending petition.

would be consistent with his other documented actions. Long after the sentencing hearing, Mr. Leland has strenuously claimed that he had nothing to do with the dissemination of the material. Mr. Leland's protestations of innocence regarding his role in the dissemination of the material that was found in the Dunroe house have come far too late, have not convinced the Court that he had nothing to do with the dissemination and, in any event, as the Court has written and re-written, it does not matter. The Dunroe evidence was cumulative. Mr. Leland sealed the applicability of the obstruction of justice enhancement when he sealed the letter to David threatening Mr. Stewart.

### c.     Omar and Don Grace

The third incident upon which the Court relied in assessing an obstruction of justice enhancement on Mr. Leland involved two codefendants, Omar and Don Grace. This was new information that was not discussed during the presentence conference, but the Government introduced the information at the sentencing hearing without objection from Mr. Leland.

Mr. and Ms. Grace were a married couple; each was involved in the Leland drug trafficking conspiracy, Ms. Grace much more than Mr. Grace. *See United States v. Donald Grace*, Docket No. 1:02-cr-00017-JAW (D. Me.). They were charged by criminal complaint on November 16, 2001 before Mr. Leland was charged by criminal complaint on April 7, 2003. Ms. Grace pleaded guilty on October 7, 2002 and was sentenced on January 8, 2003 to 130 months. *J.* (ECF No. 48-1:02-cr-00017-JAW).

63

Mr. Grace pleaded guilty on July 9, 2003 and was sentenced on March 30, 2004 to twenty-eight months. *J.* (ECF No. 100-1:02-cr-00017-JAW).

At Mr. Leland's sentencing hearing, the Government introduced a letter dated April 26, 2004 from Mr. Leland to his son Derek Leland, thanking him for "photocopying all that stuff on Omar and Donny Grace." *Sentencing Tr.* at 63. Mr. Leland commented that "[i]t is going to help a lot." *Id.* Mr. Leland did not say what the "stuff" was. Mr. Leland asked his son Derek to send the information to an attorney, marked "Legal correspondence," in the lower right-hand corner, and to mail it to Walter Cobb at the Maine State Prison, where Mr. Leland himself was housed at the time. *Id.* According to John Shedd, a correctional investigator, Mr. Leland's request to his son to copy and forward material as legal correspondence violated the prison's mail policy. *Id.*

At the sentencing, the Court did not separately discuss Mr. Leland's letter to Derek Leland, except to note that the Government had moved it into evidence. As the Court noted earlier, Mr. Leland's letter to Derek Leland enclosing "stuff" about Mr. and Ms. Grace again confirms his willingness to distribute material to third parties on other members of his conspiracy.

### d.    Conclusion: Obstruction of Justice Enhancement

For reasons this Court has explained to Mr. Leland in detail, the Court imposed the obstruction of justice enhancement against him at the sentencing hearing because the evidence demonstrated that his conduct merited the enhancement.

### 8. Acceptance of Responsibility

Mr. Leland demands that the Court "give him the three (3) point reduction he was promised for his guilty plea." *Pet'r's Mot.* at 7. He also claims that the three-level reduction was "agreed upon in the oral plea agreement." *Id.* at 11. Here, he is presumably referring to the three-level reduction under U.S.S.G. § 3E1.1. The Court has already discussed its conclusions that it has accepted Mr. Leland's Rule 11 assurance that no such oral plea agreement existed.

Turning to the terms of the written plea agreement, paragraph 3(D) provided:

> The Government agrees to recommend that the Court find that the Defendant has accepted responsibility for the offenses of conviction in the above-captioned Indictment, and that the Court should reduce by 3 levels Defendant's Adjusted Offense Level under U.S.S.G. § 3E1.1.
>
> The Government reserves the right not to recommend a reduction under U.S.S.G. § 3E1.1 if, at any time between his/her execution of this Agreement and sentencing Defendant (a) fails to admit a complete factual basis for the plea; (2) fails to truthfully admit his/her conduct in the offenses of conviction; and (c) falsely denies or frivolously contests relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3.

*Plea Agreement* at 4.

In light of this provision, unlike the obstruction of justice enhancement, AUSA Perry took the position the Government was able to argue under the terms of the plea agreement whether the Court should accord Mr. Leland a three-level reduction for acceptance of responsibility. *Sentencing Tr.* at 69-70. AUSA Perry argued against the three-level reduction for acceptance because after Mr. Leland entered his guilty plea, he continued to assert his innocence, because he had written the Court and attempted to deflect his criminal responsibility to the prosecutor, to his ex-wife, and

to "just about everybody but himself", and because he obstructed justice.  *Id.* at 70-72.  Attorney Napolitano did not separately argue the applicability of the acceptance of responsibility reduction.  *Id.* at 73 ("THE COURT:  Would you like to be heard on [acceptance], Mr. Napolitano?  MR. NAPOLITANO: No, your Honor, you have the facts.").

After reciting the language of U.S.S.G. § 3E1.1, the Court observed that if Mr. Leland had simply remained silent after he had entered his plea, the Court would have granted him acceptance.  *Id.* at 74.  But Mr. Leland had not remained silent. Instead, he had engaged in a "sort of campaign" by writing letters, including letters to the Court.  *Id.*  The problem was that "in some of the letters he wrote to me and some of the letters he wrote elsewhere, and what he did in court, he essentially denied what he admitted to at the time of his earlier plea."  *Id.* at 74-75.  The Court noted that contrary to the terms of his plea agreement, he wrote on March 11, 2004 that "I'm saying that I wasn't the leader or organizer of anything."  *Id.* at 75 (quoting *Gov't's Ex.* 18).  He wrote that he knew of "only a little over 200 grams of meth and he implies that perhaps his ex-wife [Genessa], planted it."  *Id.*

One factor a court must examine in determining whether to grant a motion to withdraw a guilty plea is whether the defendant is claiming he is actually innocent of the crimes to which he pleaded guilty.  *See Order on Def.'s Mot. to Withdraw Guilty Plea* at 5, 12-13 (citing *United States v. Padilla-Galarza*, 351 F.3d 594, 597 (1st Cir. 2003); *United States v. Gonzalez*, 202 F.3d 20, 24 (1st Cir. 2000); *United States v. Richardson*, 225 F.3d 46, 51 (1st Cir. 2000)) (ECF No. 291).  Accordingly, at Mr.

Leland's sentencing the Court returned to what Mr. Leland had maintained when he filed his motion to withdraw his guilty plea. *Sentencing Tr.* at 73-78. The Court noted that at the oral argument on the motion to withdraw the guilty plea, the Court asked Attorney Largay whether Mr. Leland was saying that he was actually innocent of the charges or was just maintaining that the Government could not prove them. *Id.* at 75-76. After consulting with Mr. Leland, Attorney Largay stated: "Well, I conferred with him a moment ago, your Honor. He maintains innocence with respect to more than just that one crime. That's what I was thinking previously." *Id.* at 76 (quoting *Oral Argument on Mot. to Withdraw Guilty Plea* 30:24-31:2 (ECF No. 290) (*Tr. Withdrawal of Plea Mot.*)). The Court closely questioned Mr. Largay as to whether Mr. Leland "saying someone else did it, 'I'm innocent,' is that right?" *Id.* at 77 (quoting *Tr. Withdrawal of Plea Mot.* at 33:14-19). Mr. Largay responded, "That is what he is maintaining, Your Honor." *Tr. Withdrawal of Plea Mot.* at 33:20-21. The Court pressed Attorney Largay whether Mr. Leland was even claiming actual innocence on the firearm charge and Mr. Largay responded that he was. *Id.* at 33:22-24.

Last, the Court turned to a letter Mr. Leland had authored entitled, "The Fall of an Angel" in which Mr. Leland elaborated why he contended that other people were responsible for the crimes to which he had pleaded guilty. *Sentencing Tr.* at 77. The Court agreed with AUSA Perry that "in that eight-page letter, he blame[d] . . . virtually everybody but himself." *Id.*

Based on this cumulative evidence, the Court concluded at the sentencing hearing that "it is abundantly clear, absolutely clear, without any wiggle room here that he is not entitled to a reduction for acceptance of responsibility because he doesn't accept responsibility." *Id.* at 78.

In his pending motion, Mr. Leland has provided the Court with no reason to revisit its finding at the time of sentencing that he had not accepted responsibility for the offenses of conviction as required under U.S.S.G. § 3E1.1 for a three-level reduction. Mr. Leland's only current charge is that the Court and the Government violated the terms of his plea agreement in failing to accord him the three-level reduction, but in fact, Mr. Leland himself violated the terms of the plea agreement by attempting to withdraw his plea and repeatedly asserting that he was not guilty of the crimes to which he had pleaded guilty. As the Court stated during the sentencing hearing, Mr. Leland is "not entitled to a reduction for acceptance of responsibility because he doesn't accept responsibility." *Id.* at 78; *see* U.S.S.G. § 3E1.1, n. 1(A) (*In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to the following: (A) truthfully admitting the conduct comprising the offense(s) of conviction . . . .*").

### 9.   Ineffective Assistance of Counsel

Mr. Leland now says that Attorney Robert Napolitano was ineffective in representing him at his sentencing. *Def.'s Pet.* at 10-11; *Def.'s Mot.* at 2. However Mr. Leland wishes to characterize it, this motion "is in substance an application for leave to file a second or successive application under 28 U.S.C. § 2255." *J.* at 1 (ECF

No. 391); *see Trenkler*, 536 F.3d at 97 (1st Cir. 2008) (quoting *Melton v. United States*, 359 F.3d 855, 857 (7th Cir. 2004)) ("Any motion filed in the district court that imposed the sentence, and substantively within the scope of § 2255 ¶ 1, *is* a motion under § 2255, no matter what title the prisoner plasters on the cover") (emphasis in original). His attempt to charge Attorney Napolitano, as opposed to his earlier counsel Attorney Largay, with ineffective assistance of counsel is barred because it is too late, because it is a second or successive petition on a sentencing issue, and because he is in the wrong court; that is, he has not obtained the First Circuit's prior permission to file the petition.  18 U.S.C. § 2255(f), (h); 28 U.S.C. § 2244(b)(3)(A) (a petitioner must obtain advance approval of the appellate court before proceeding with a successive § 2255 petition).

### 10.   Disparate Sentences

In his petition, Mr. Leland argues that his sentence of 252 months was disparate from other similarly-situated codefendants. *Def.'s Pet.* at 16-17.  Mr. Leland does not specifically mention any codefendants, what their sentences were, and why his sentence was unlawfully disparate. *Id.*  Mr. Leland's argument is too undeveloped to state a legal contention.  Specifically, Mr. Leland points to no other defendant who carried his set of enhancements, resulting in a Guideline sentence of 235 to 293 months.

## III.   MOTION TO EXPUNGE CONVICTION

### A.   The Motion

By letter motion dated February 23, 2015, Mr. Leland asked the Court to expunge his conviction on the felon in possession charge. *Def.'s Mot. to Expunge Conviction* (ECF No. 411). Mr. Leland explained that under Bureau of Prisons (BOP) rules, he is not entitled to receive a twelve-month reduction in sentence because of the firearms conviction but that his case manager told him that if the Court expunged the conviction, he could receive the twelve-month credit under BOP rules. *Id.* at 1-2. Mr. Leland asserts that at the sentencing hearing or the Rule 11 colloquy, he informed the Court that he was not guilty of some of the charges but that he pleaded guilty to save his son. *Id.* at 1. He argues that his firearms conviction was based on a receipt and he objects to the use of a receipt to establish possession. *Id.* To his motion, Mr. Leland attached another letter addressed to this Judge, which goes into detail about his view that his sentence was improperly enhanced, that he never obstructed justice, that he was not a leader or manager, that he never possessed some of the drugs as charged, and that his drug quantity was improperly enhanced by ghost drugs. *Id.* Attach. 1 *Letter from William Leland to Judge Woodcock* at 1-6 (Feb. 18, 2015). Mr. Leland also attached a BOP denial of his request for a § 3621(e) offense review. *Id.* Attach. 2 *Req. for § 3621(e) Offense Review* at 1-2 (Nov. 18, 2014).

## B.    The Felon in Possession Offense

On September 26, 2003, a federal grand jury indicted Mr. Leland for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). *Second Superseding Indictment* at 6-7 (ECF No. 60). Count Fourteen of the second superseding indictment charged that Mr. Leland had been convicted of a crime publishable by

imprisonment for a term exceeding one year, specifically Receiving Stolen Property, Superior Court, Penobscot County, March 22, 1983, Docket Number CR-83-216. *Id.* It further charged that in or about December 2002 in the District of Maine, Mr. Leland knowingly possessed in and affecting interstate commerce the following firearms: (1) a Colt, MK IV, .45 cal. pistol, Serial Number FC25560, (2) a Ruger, GP100, .357 mag. Cal. revolver, Serial Number 171-97086, and (3) a Beretta, Model 9000S, .40 caliber pistol, Serial Number SN011117. *Id.*

On January 27, 2004, Mr. Leland entered a plea of guilty to the firearm charge along with a number of other charges. *Minute Entry* (ECF No. 205). The Government prepared a prosecution version of the offenses for purposes of the Rule 11 hearing. *Gov't's Version of the Offense* (ECF No. 206). Regarding the firearms possession charge, the prosecution version reads:

> The evidence and testimony also would show that as of 2002 and 2003, the defendant had been convicted of a crime which under the laws of the State of Maine was then punishable by imprisonment for a term exceeding one year, specifically, Receiving Stolen Property, Superior Court, Penobscot County, March 22, 1983, Docket Number CR-83-216, and that the defendant knowingly possessed the three firearms listed in Count Fourteen and that none of the firearms were manufactured in Maine. The evidence would show that the defendant either gave, or received, each firearm as a gift.

*Id.* at 2. During the Rule 11 hearing, Mr. Leland assured the Court that he was pleading guilty because he was actually guilty. *Rule 11 Hr'g* 5:16-19. After being reminded that he had to be honest with the Court, Mr. Leland confirmed that he had read the Government's Version of the Offense and that he did not disagree with any

71

of the contents of the Government's Version and that the contents of the Government's Version were true to his own personal knowledge. *Id.* 18:5-18.

## C.   Expunging the Firearms Conviction

Mr. Leland cites no authority for his request that the Court expunge his firearms conviction and the Court could find none.  There is very limited statutory authority for a federal court to expunge a criminal record and none of those provisions applies here.  *See* 28 U.S.C. § 534(a) (requiting the Attorney General to "acquire, collect, classify and preserve" criminal identification records); 5 U.S.C. § 552a(d), (g)(1)(C) (allowing claims to amend public records that are inaccurate); 21 U.S.C. § 844a(j) (allowing for expungement of civil penalty records in certain drug possession cases); 10 U.S.C. § 1565(e) (requiring the Secretary of Defense to expunge the records of a DNA analysis when a court overturns a military conviction); 18 U.S.C. § 3607(c) (authorizing a federal court to expunge the record of the disposition of a Controlled Substance Act offense when the person received pre-judgment probation, was less than twenty-one years old at the time of the offense, and the person applies for the expungement order); 42 U.S.C. § 14132(d) (permitting the Director of the FBI to expunge DNA records of individuals in certain cases where the convictions were overturned).

Mr. Leland's request for expungement is bottomed on the ancillary consequences within the BOP of his conviction and he makes an equitable plea for the Court's intervention.  However, in *United States v. Coloian*, 480 F.3d 47 (1st Cir. 2007), the First Circuit joined those circuits that have concluded that a district court

does "not have jurisdiction to consider [a defendant's] request for the expungement of his criminal record on equitable grounds." *Id.* at 52; *Boroian v. Mueller*, 616 F.3d 60, 67 (1st Cir. 2010) (addressing identification records of convicted felons). As this Court owes allegiance to the pronouncements of law from the First Circuit, the Court concludes that it must dismiss Mr. Leland's motion for expungement because the Court has no jurisdiction to consider it.

## IV.   MOTION FOR SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(2)

On November 4, 2014, Mr. Leland filed a pro se motion under Amendment 782 and ineffective counsel. *Habeas Corpus Mot. to Correct Sentence under Amendment 782 and Ineffective Assistance of Counsel* (ECF No. 398). In the motion, he makes two arguments, one successful, one not. The unsuccessful argument is his claim of ineffective counsel. The Court addressed this issue in this Order and denies that part of his motion.

Mr. Leland, however, has stated a valid claim for sentence reduction under Amendment 782 of the United States Sentencing Guidelines. *See* U.S. SENTENCING GUIDELINES MANUAL app. C, Amendment 782 (2014). So long as the effective date of the order is November 1, 2015 or later, under Amendment 782, the Sentencing Commission has allowed for a two-level reduction in the calculation of the base offense level for defendants like Mr. Leland. U.S.S.G. § 1B1.10(d), (e)(1). As Mr. Leland's total offense level was 38 and the criminal history category was I, his Guideline sentence range was from 235 to 293 months and the Court imposed a 252-month sentence in the lower end of the applicable Guideline sentence range.

*Sentencing Tr.* at 102. If the two-level reduction is applied, Mr. Leland's total offense level is reduced to 36. As his criminal history category remains Category I, the newly calculated Guideline sentence range is 188 to 235 months. In Mr. Leland's case, the PO recalculated Mr. Leland's sentence to equal 201 months, proportionally reducing Mr. Leland's sentence. *Revised Presentence Investigation Report—2014 Drug Reduction Act* (revised Feb. 23, 2015) (RPSR). The Court appointed David Beneman, the Federal Defender for the District of Maine, as Mr. Leland's counsel in this matter, *see Order Appointing Counsel Pursuant to 18 U.S.C. § 3582(c)(2)* (ECF No. 401), and Federal Defender Beneman has indicated no objection to the proposed reduction to 201 months.

The Sentencing Commission made such reductions contingent upon the sentencing judge's evaluation of the particular defendant. The Guidelines direct the Court to review the statutory factors in 18 U.S.C. § 3553(a), to assess any public safety considerations, and to evaluate the defendant's post-sentencing conduct before acting on motion for reduction. U.S.S.G. § 1B1.10(e)(1)(B). The statutory factors in § 3553(a) include such factors as the defendant's history and characteristics, the nature and circumstances of his offenses, the need to protect the public from future crimes of the defendant, the need to provide the defendant with educational training or corrective treatment. 18 U.S.C. § 3553(a).

The Court has repeatedly told Mr. Leland that it has been pleased to learn he has done so well during incarceration. Mr. Leland is now older, and presumably wiser, than he was at the October 27, 2005 sentencing hearing. There is no evidence

that he has violated BOP rules or has been anything other than the model prisoner he claims to be. The many letters that the Court received in his favor from relatives and friends indicate that, once released, Mr. Leland will have a strong support group. Although Mr. Leland's crimes were serious and merited a significant penalty, the Court takes him at his word that he is a changed man, that he excommunicated himself from the Hells Angels, that he has taken advantage of numerous educational and drug rehabilitation classes, including classes on residential wiring and rebuilding electric motors, that he has tutored others, and that he has earned a certificate for paralegal studies. Finally, the newly-calculated sentence, combined with ongoing supervised release, should be an effective deterrent for Mr. Leland. The Court suspects that having once traveled down the road of criminality and realized its repercussions, Mr. Leland is not likely to travel down that same road again. The Court's biggest concern about Mr. Leland is his obstinate refusal to accept this Court's and the First Circuit's rulings denying his complaints about his sentence. Perhaps now that his sentence has been reduced to 201 months, a substantial reduction, Mr. Leland will finally reconcile himself to the reduced sentence and will stop, as he promised, his relentless and unproductive post-judgment filings.

The Court therefore grants his motion for sentence reduction under Amendment 782 of the Guidelines and reduces his sentence to 201 months. Contemporaneous with this opinion, the Court has issued an Order Regarding Motion for Sentencing Reduction Pursuant to 18 U.S.C. § 3582(c)(2) reducing Mr. Leland's sentence from 252 months to 201 months. With this opinion and result, the Court

hopes that Mr. Leland is finally able to turn his attention away from attempting to relitigate the past and instead face the more urgent and immediate task of preparing for the future.

## V.    CONCLUSION

The Court DENIES the Motion to Reconsider Petitioner's Writ of Audita Querela Pursuant to the All Writs Act, 28 U.S.C. § 1651 (ECF No. 408).

The Court DENIES Defendant's Motion to Expunge Conviction (ECF No. 411).

The Court DENIES in part and GRANTS in part Defendant's Habeas Corpus Motion to Correct Sentence under Amendment 782 and Ineffective Assistance of Counsel (ECF No. 398). The Court DENIES so much of the motion as demands relief based on ineffective assistance of counsel and GRANTS so much of the motion as demands relief pursuant to Amendment 782 of the United States Sentencing Commission Guidelines and reduces William Leland's period of incarceration from 252 to 201 months.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of April, 2015